STATE of Missouri, Respondent,

v.

Stephen K. JOHNS, Appellant.

No. 64731.

Supreme Court of Missouri,
En Banc.

Oct. 9, 1984.

Rehearing Denied Nov. 20, 1984.

 

Robert J. Maurer, Asst. Public Defender, Clayton, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

WELLIVER, Judge.

Appellant was convicted of capital murder, § 565.001, RSMo 1978, in the Circuit Court of the City of St. Louis and the jury, having found the aggravating circumstances required by law, imposed the death sentence. He now appeals assigning numerous grounds for reversal. We have jurisdiction under Mo. Const. art. V, § 3. We affirm.

The evidence adduced at trial established that on February 18, 1982, an Onyx Gas Station in the City of St. Louis was robbed of approximately $248. A customer who stopped at the station shortly before 8 p.m. discovered the body of the seventeen year old attendant lying face down in a storage room with bullet wounds in the back of his head. The medical examiner who performed the autopsy testified that she found three bullet holes—all within one inch of each other—behind the victim's right ear. One of the bullets had been fired from a distance of less than six inches from the victim's head. The autopsy also revealed a bruise on top of the victim's head.

The state presented substantial evidence tying appellant with the crime. The jury could have believed that during the weeks preceding February 18, 1982, appellant had discussed his plan for robbing the Onyx station with Linda Klund, a long-time acquaintance, and another acquaintance, David Smith. The latter testified that on one occasion appellant stated that he "never left any witnesses." On the day of the crime appellant purchased fifteen .32 caliber shells at a sporting goods store. Klund drove appellant and a second man, Robert Shawn Wishon, to the station. She testified that appellant had a handgun. Klund parked the car a short distance from the station and waited while appellant and Wi-

shon went into the station. When they returned, she followed an escape route planned earlier at appellant's direction. After disposing of the money bag, later recovered, Klund dropped off Wishon and, later, appellant. Appellant gave her $50 and asked her to take a bag containing the gun and bullets so he would not have it in case he was picked up.

Police went to appellant's home at approximately 9:30 p.m. on February 18 where they were admitted by appellant's mother. Appellant was not there. A police detective seized several sheets of paper found on a chair in appellant's bedroom. Shortly thereafter, police officers interviewed Klund at her home. She denied any involvement in the crime. Appellant called Klund after the police officers had left and she informed him that the police were looking for him. He instructed her to get rid of the gun, which she did by hiding it above the ceiling of her apartment.

Appellant came to the home of Albert Keener at about midnight that evening. Appellant told Keener that he was in a lot of trouble; that he and Wishon had robbed the station and that he had shot the attendant in the head three times. Appellant remained at Keener's home that night and the following day. Keener contacted a police officer whom he knew and informed him of appellant's whereabouts, leading to appellant's arrest on February 19.

## I

Though the evidence, all circumstantial, tended to show that appellant was the triggerman, the state submitted the case to the jury on a theory of accomplice liability. Appellant now raises a host of objections to the use of Instruction No. 5, the verdict director patterned after MAI-CR2d 2.12 (rev.1983). The instruction follows:

A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about February 18, 1982, in the City of St. Louis, State of Missouri, the defendant or Robert Wishon caused the death of Donald Voepel, Jr., by shooting him, and

Second, that the defendant or Robert Wishon intended to take the life of Donald Voepel, Jr., and

Third, that the defendant or Robert Wishon knew that he was practically certain to cause the death of Donald Voepel, Jr., and

Fourth, that the defendant or Robert Wishon considered taking the life of Donald Voepel, Jr., and reflected upon this matter coolly and fully before doing so,

then you are instructed that the offense of capital murder has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the commission of capital murder, the defendant acted together with or aided or encouraged Robert Wishon in committing that offense,

then you will find the defendant guilty of capital murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions submitted in this instruction, you must find the defendant not guilty of that offense.

We note at the outset that appellant's motion for a new trial complained only that the instruction "failed to properly follow MAI–CR2d, and did not adequately instruct the jury with respect to the applicable law." Because we conclude the instruction was properly used in this case, we need not decide whether the objection was sufficiently specific to preserve the particular points appellant now advances. *See* Rule 23.03.

■ Appellant first contends this case was an inappropriate one in which to use an instruction patterned after MAI–CR2d 2.12, citing Notes on Use 6(d), 8(a) and 4. We find nothing in the notes that contradicts use of MAI–CR2d 2.12 in this case. Note on Use 6(d) states that a prosecutor need not, but may choose to use the instruction in cases where the evidence shows the conduct constituting the elements of the offense was committed solely by the defendant. Inasmuch as the instruction requires the state to prove that the defendant acted with the purpose of promoting capital murder in addition to the standard elements of capital murder, appellant will not be heard to claim any prejudice from its use. Note on Use 8(a) prohibits the use of MAI–CR2d 2.12 in cases where "the defendant is being held responsible for the conduct of another person and that person is not guilty of the offense." Appellant's accomplice, Robert Shawn Wishon, has been convicted of second degree murder pursuant to a guilty plea. Arguably, this fact precludes use of MAI–CR2d 2.12 in this case. We decline to hold, however, that it was reversible error to use the instruction under these circumstances since a fair assessment of the evidence supports the conclusion that identical charges could reasonably have been brought against both partners had Wishon not pleaded guilty to a lesser offense. We have examined Note on Use 4 and we found nothing in it hindering use of the instruction in this case.

Appellant also contends the instruction failed to properly submit the applicable law. In particular, appellant asserts that the instruction, by submitting each of the elements of capital murder in the disjunctive, permitted the jury to convict appellant even if it determined that Wishon possessed all the necessary elements of capital murder. Thus, appellant complains the instruction enabled a jury to find him guilty of capital murder without attributing to him the necessary mental state. Appellant's argument is identical in substance to the one we rejected in *State v. White*, 622 S.W.2d 939 (Mo.banc 1981), *cert. denied*, 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487

(1982). The defendant in that case, charged with capital murder, contended that the prior version of MAI–CR2d 2.12 improperly stated the law because it failed to require the jury to find that the defendant had the intent required for the commission of the underlying felony. He argued, as does appellant here, that this state's law of accomplice liability required that the jury find that the aider had both the intent to commit the underlying offense and the intent to purposely promote the commission of the offense. In *White* we dismissed the contention, holding that the jury need only find that the aider purposely aided in the capital murder. Judge Higgins explained the holding in this way:

> When, as in the present case, the aider is found to have purposely aided in capital murder and thus has the same intent of the active participant, all other things being equal, they are liable to the same degree. Situations can exist where the liability of each is not the same. In such cases, § 562.051, RSMo 1978, permits the defendant or the state to present evidence aggravating or mitigating the matter. For example, defendant may introduce evidence showing that he did not have the purpose or conscious object of aiding in capital murder. Contrary to appellant's argument, § 562.051, RSMo 1978, does not create any elements of intent in addition to that of § 562.041, RSMo 1978.

622 S.W.2d at 945.

■ The jury in the case before us was instructed in accordance with our holding in *White*. The fifth paragraph of Instruction No. 5 required that the jury determine "that with the purpose of promoting or furthering the commission of capital murder, the defendant acted together with or aided or encouraged Robert Wishon in committing that offense." This modification of the instruction accurately submitted the elements necessary for convicting appellant of capital murder on a theory of accomplice liability. The fact that the instruction differs from the format suggested in Note on Use 7, by not requiring the jury also to find

that the defendant "reflected upon this matter coolly and fully," is of no consequence in light of our holding in *State v. White, supra.*

■ Appellant contends, however, that use of the fifth paragraph was error because there was no evidence in the record to support the charge that he promoted the offense of capital murder. He argues that there was only evidence of a conspiracy to rob the gas station. The contention ignores testimony of David Smith, who stated that defendant told him that he "never left any witnesses." The jury would have been permitted to find that appellant planned the robbery with the intention to kill the attendant.

■ Appellant also assigns error to the fact that Instruction No. 5 contained the phrase "then you *will* find the defendant guilty ...," instead of the phrase "then you *may* find the defendant guilty...." (Emphasis added.) The latter phrase was required by Note on Use 3 of the former version of MAI–CR2d 2.12 whereas the former is now required by the current version of the instruction. Appellant concedes that Instruction No. 5 was patterned after MAI–CR2d 2.12 as revised and use of the instruction in this case, tried before the revised instruction became effective on January 1, 1983, was not error. Nevertheless, appellant claims error on the basis that the use of "will" rather than "may" was in direct violation of the older note on use still in effect at the time of trial. The point, plainly frivolous on its face, is denied. Nor is there any merit in appellant's contention that the instruction did not permit him to fashion a converse instruction. While the record indicates that appellant did not submit a converse instruction during the instruction conference, we see nothing in the instruction as submitted that causes us to believe the omission resulted from something inherent in the instruction. Failure to give a converse instruction does not constitute plain error.

Since we have concluded that Instruction No. 5 properly submitted the law, we need not address appellant's complaint that the instruction, by calling for the conviction of capital murder on an overly broad basis, precluded the jury from giving due consideration to the lesser included offense of second degree murder and manslaughter.

## II

■ Appellant next contends the trial court erred in refusing to instruct the jury on first degree murder. He concedes that the trial court's decision was consistent with our decision in *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983), holding that first degree murder, as defined in § 565.003, RSMo 1978, is not a lesser included offense of capital murder, but he urges us to reconsider and overrule that decision. Our holding in *Baker* reflects the truism inherent in the homicide scheme used in this state prior to September 30, 1984 that a homicide charged as capital murder need not also constitute murder in the first degree since the latter offense requires proof of an element, the commission of a prescribed felony, that the former does not. First degree murder, therefore, cannot be considered an offense "established by proof of the same or less than all the facts required to establish the commission of the offense charged." § 556.046(1), RSMo 1978. *See also State v. Betts,* 646 S.W.2d 94, 96 (Mo. banc 1983); *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983) Appellant's point is denied.

## III

Appellant claims the trial court should have suppressed certain handwritten notes seized from his bedroom during the course of a warrantless search and admitted as evidence at trial. Respondent maintains, and the trial court apparently believed, that the search was conducted with the consent of appellant's mother, with whom he shared an apartment, and that the notes were seized as evidence discovered in plain view. Appellant disputes that characterization, contending either that the police

searched the apartment without his mother's voluntary consent or that the search exceeded the scope of her consent. Alternatively, he argues that his mother lacked authority to consent to the search of his bedroom.

 In reviewing the trial court's ruling on the motion to suppress, we limit our inquiry to whether the court's decision is supported by substantial evidence. *State v. Blair, supra,* at 748, *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Boggs,* 634 S.W.2d 447, 453 (Mo. banc 1982); *State v. Higgins,* 592 S.W.2d 151, 158 (Mo. banc 1979), *appeal dismissed,* 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980). We accord due regard to the trial court's opportunity to judge the credibility of witnesses. *State v. Boggs, supra,* at 453; *State v. Higgins, supra,* at 158.

Based on the evidence presented at the suppression hearing, the trial court reasonably could have determined the following: appellant quickly became a suspect in the police investigation of the robbery-murder at the Onyx Station on the basis of information, previously obtained from a confidential informant, indicating that appellant had planned to rob the station a month earlier. On the evening of February 18, 1982, six to eight police officers went to the apartment in which appellant resided with his mother. They encountered Mrs. Johns and another woman outside the building. One of the officers asked Mrs. Johns if they could search the apartment for appellant; apparently she acquiesced since she opened the door and let the officers in.

Shortly thereafter, Detective Daniel Nichols and another officer arrived at the apartment and knocked at the door. A police officer opened the door and Nichols identified himself to Mrs. Johns as a police officer, who indicated he could enter. Once inside Nichols determined that the other officers, who were preparing to leave, had not found appellant in the apartment. When the other officers departed, he asked Mrs. Johns if it was all right if he looked around, and she replied "go right ahead."

Nichols walked into the bedroom used by appellant and saw a sheaf of papers on the cushion of any easy chair. Written on the top page were a number of words, including "employees on duty," "alarms," "routes out" and "money location."

Nichols seized the papers but Mrs. Johns grabbed them from his hands, saying "I don't think I want you to take these." She carried them into another room and left them at an unspecified location where they were retrieved by a police officer.

 The state defends its use of the evidence on the theory that the papers constitute evidence seized in plain view. In order for the evidence to be admissible under the plain view doctrine, the state must show three elements: (1) the initial intrusion affording the authorities the plain view was lawful; (2) the evidence was discovered inadvertently; and (3) the incriminating nature of the evidence must have been immediately apparent. *State v. Collett,* 542 S.W.2d 783, 786 (Mo. banc 1976). *See also Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). There is no dispute regarding the latter two elements; the controversy herein concerns whether the police officer who seized the papers had a right to be in appellant's bedroom.

 The state contends appellant's mother voluntarily admitted the police into the room. The Fourth Amendment permits consensual searches conducted without a warrant so long as the consent to the search was voluntary and not the product of duress, coercion or fraud. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *State v. Blair, supra,* at 750. "Whether there was a voluntary consent is to be determined by the totality of the circumstances." *State v. Blair, supra, id.* When the state seeks to justify a warrantless search on the basis of consent, it must prove by a preponderance of the evidence that the consent was voluntarily given. *State v. DuBose,* 617 S.W.2d 509,

514 (Mo.App.1981); *State v. Sayles*, 579 S.W.2d 748, 751 (Mo.App.1979).

■ Appellant argues that the evidence shows that his mother had not freely and voluntarily consented to either the police officers' initial entrance into the apartment or the search by Detective Nichols that led to the seizure of the disputed evidence. The record belies the charge. Mrs. Johns testified that she encountered the police officers while she was outside her apartment and opened the door so that they could see if her son was there. There is not a shred of evidence suggesting that the police pressured or coerced Mrs. Johns to gain entrance into the apartment. The trial court also would have been permitted to believe that Mrs. Johns consented to Detective Nichols' examination of the apartment after the first group of officers left. Appellant suggests the detective misled his mother into believing that he intended merely to satisfy himself that appellant was not present while, in fact, he furtively searched the apartment for evidence. Appellant's scenario is rebutted by Detective Nichols' testimony, which the trial court properly could have credited, that he asked Mrs. Johns if he could "look around" and she replied "go right ahead."

■ Appellant next argues that even if his mother consented to the officers' presence in his bedroom, the seizure of the evidence was improper because his mother had no authority to consent to their entry into his bedroom. It is settled Fourth Amendment law that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). *See also Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). The Supreme Court has indicated that "common authority" in this context refers to

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock, supra*, at 171, n.7, 94 S.Ct. at 993, n. 7. The conclusion is inescapable that Mrs. Johns had the requisite degree of control over appellant's bedroom. All the evidence supports the view that appellant and his mother jointly shared the apartment. While Mrs. Johns described appellant's bedroom as the location where he "kept all his stuff," she also called it "sort of a living bedroom." On this record, we decline to draw narrow lines of demarcation between the property and space of mother and son. *See State v. Pruitt*, 479 S.W.2d 785, 788 (Mo. banc 1972).

■ Finally, appellant contends that the seizure was accomplished through the use of physical force. The charge is based solely on the testimony of Mrs. Johns and is contradicted by other testimony indicating the papers were recovered by a police officer after Mrs. Johns placed them in another room. It is also suggested that Mrs. Johns effectively revoked her consent by grabbing the papers from the hands of Detective Nichols. We reject the notion one can revoke his or her consent to a search after incriminating evidence has been discovered. *See United States v. Black*, 675 F.2d 129 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

### IV

Appellant raises several points concerning the jury selection process. He first alleges that the trial court erred in overruling his motion to strike for cause venirewoman Emily Alonzo. During voir dire Mrs. Alonzo stated that her daughter had known the victim "[s]lightly. Just from dances and things." The prosecutor then inquired:

> **Mr. Ankney:** She didn't go to school with him? Where did your daughter go to [school]? . . .

**Venirewoman Alonzo:** She went to St. Louis Academy. But you know how different schools get together.

**Mr. Ankney:** Sure. Can you sit on a jury and make your decision based on the evidence that you hear in the witness stand?

**Venirewoman Alonzo:** Yes.

**Mr. Ankney:** I mean, obviously, you made—your daughter knowing a boy, you might have some feeling about that. But Mr. Johns is entitled to a fair trial. And due to that you need a—12 people who will make their decision based on the evidence. Do you feel you can do that?

**Venirewoman Alonzo:** I feel I can. Yeah.

During his examination of the venirewoman, defense counsel made the following inquiry:

**Mr. Richardson:** ... Other people have said they read about the case and they knew members of—had no knowledge of victim. So you're a little bit different [from] someone who has just read about it. Do you feel that this fact would in any way enter your mind? Or do you think you'd be expected to? You know, we're asking at this point—this time to state whether or not you could or not completely divorce yours[elf] from this idea. Put it completely out of your mind.

Now, I know that's a hard thing. And we're not asking you to do the impossible. We're asking you whether or not you can. And if you can't that's perfectly acceptable.

**Venirewoman Alonzo:** I don't think I can.

**Mr. Richardson:** You don't think you can set it out of your mind?

**Venirewoman Alonzo:** (Shook head in back and forth motion.)

**Mr. Richardson:** So you think this—if and when you are selected and if and when there is a deliberation in this case this would be in your mind and enter into it?

**Venirewoman Alonzo:** Yeah.

The following exchange then occurred between the prosecutor and the venirewoman:

**Mr. Ankney:** ... You said it would enter into your mind. I want to go one step farther back to where we were. No one can remove thoughts from a person's mind. But can you make the decision fairly and based upon the evidence that you hear on the witness stand?

**Venirewoman Alonzo:** I think I can.

■ Our decisions have repeatedly indicated that the trial court is accorded wide discretion in determining the qualifications of venirepersons, and its decision will not be disturbed absent a clear abuse of discretion and prejudice to the complaining party. *State v. Draper*, 675 S.W.2d 863 (Mo. banc 1984); *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). We have no trouble holding that the trial court did not err in overruling appellant's motion to strike for cause venirewoman Alonzo. She testified that her daughter and the victim had attended different schools and had been only casually acquainted. When asked whether she could base her decision on the evidence, she answered affirmatively. The trial court properly could have decided that Mrs. Alonzo could serve as a fair and impartial juror even though her daughter had known the victim.

■ Appellant makes much of the fact that Mrs. Alonzo was unable to say when pressed by defense counsel that her daughter's acquaintance with the victim would not enter her mind. A trial court has a duty to closely evaluate the qualifications of a venireperson who indicates that a prior experience or association may enter into his or her mind during deliberations. *Cf. State v. Draper, supra.* Admissions of this nature are "important insofar as they might have prejudiced the prospective juror against the appellant." *State v. Land*, 478 S.W.2d 290, 292 (Mo.1972). They do not however, necessarily render a venireman unqualified to sit as a juror. "The question of whether or not the experience could be 'put out of his mind' is not determinative of

the qualifications of the venireman. The question properly is whether or not that experience would produce bias or prejudice against the defendant on trial." *State v. Olinghouse,* 605 S.W.2d 58, 70 (Mo. banc 1980).

We cannot say the trial court abused its discretion when it failed to excuse Mrs. Alonzo. Both before and after the exchange with defense counsel that appellant now questions, Mrs. Alonzo indicated that she could base her decision on the evidence presented at trial. Moreover, her daughter's distant association with the victim is not the type of experience or incident likely to produce prejudice against appellant so as to persuade us to overturn the trial court's ruling in this instance. *Compare State v. Land, supra; State v. Thompson,* 541 S.W.2d 16 (Mo.App.1976).

■ Appellant also alleges that Mrs. Alonzo "indicated a vehement preference for the death penalty." The testimony cited to us falls far short of substantiating the charge.[1]

The trial court dismissed for cause venirewoman Laura Jones on the ground that she was categorically opposed to imposing the death penalty in this case. Appellant now claims that Ms. Jones' answers were equivocal on the death penalty issue and her exclusion from the jury violates *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Ms. Jones initially indicated that she could consider imposing the death penalty in "some cases," such as cases involving child rape. The prosecutor then informed her that the charge in the case was capital murder and he inquired: "Would you consider it in this case?" She replied "No." Voir dire continued as follows:

**Mr. Ankney:** You could not consider it in this case because a small child was not raped. Is that correct?

**Venirewoman Jones:** Well, yeah. I would not consider it in this case.

**Mr. Ankney:** Okay. And so, therefore, if you sit on the jury and Judge instructs you there are only two punishments, you could not consider the death penalty in this case?

**Venirewoman Jones:** No.

. . . .

**Mr. Richardson:** All right. Now, you said before you could consider the death penalty under some circumstances. Is that correct?

**Venirewoman Jones:** Yeah.

**Mr. Richardson:** So you could consider the death penalty?

**Venirewoman Jones:** On some cases.

**Mr. Richardson:** Right. We're not asking you to consider it in this case. It hasn't come up yet. But we're just asking you if you could consider it under some cases and your answer is yes?

**Venirewoman Jones:** Yes.

**Mr. Richardson:** Thank you. I have no further questions.

. . . .

**Mr. Ankney:** Let me go back to my question. I don't know what he's asked you on any case. My question on this case. The charge is capital murder. If you go into the jury room and you found him guilty of capital murder, would you consider imposing the death penalty?

**Venirewoman Jones:** No.

■ Our Federal Constitution guarantees to criminal defendants a jury consisting of individuals representing a fair cross-section of the population. In *Witherspoon v. Illinois, supra,* the Supreme Court held that this precept barred the

---

1. Appellant makes reference to the following exchange between Mrs. Alonzo and the prosecutor:

 **Mr. Ankney:** Okay. And so, therefore, if you sit on the jury and Judge instructs you there are only two punishments, you could not consider the death penalty in this case?

 **Venirewoman Jones:** No.

 **Mr. Ankney:** Ms. Alonzo, how do you feel?

 **Venirewoman Alonzo:** I feel capital punishment.

 **Mr. Ankney:** I am sorry?

 **Venirewoman Alonzo:** Capital punishment.

 **Mr. Ankney:** You would be in favor of it in [a] certain case?

 **Venirewoman Alonzo:** Right.

systematic exclusion of venirepersons for cause merely because they voiced generalized objections to the death penalty. *Id.* at 522, 88 S.Ct. at 1777. Concern for the countervailing principle that jurors must be willing to follow the relevant law compelled the Court to recognize that venirepersons may be properly excluded for cause where they make it "unmistakably clear ... that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." *Id.* at 522, n.21, 88 S.Ct. at 1777, n.21. The excerpt from the transcript leaves no doubt that Ms. Jones was unequivocally opposed to imposing the death penalty in this case. The fact that Ms. Jones initially indicated a willingness to consider capital punishment in certain hypothetical situations does not render her immune from exclusion for cause, if she is otherwise qualified, under the doctrine of *Witherspoon v. Illinois, supra. Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983); *Jacobs v. State,* 361 So.2d 607, 626–27 (Ala. Crim.App.1977), *cert. denied,* 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979); *Sanne v. State,* 609 S.W.2d 762, 768–69 (Tex.Crim.App.1980), *cert. denied,* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981). The Fifth Circuit in *Williams v. Maggio, supra,* concluded that:

> *Witherspoon* and its progeny do not mandate that a prospective juror aver that she would refuse to consider the death penalty in every case that could possible [sic] arise. If she knows enough about the case to know that she could not consider imposition of the death penalty regardless of what evidence might be presented, she must be excused.

*Id.* at 385–86. The trial court properly dismissed Ms. Jones.

In his next point, appellant alleges that the exclusion of venirepersons who expressed an inability to impose the death penalty [2] denied him a jury selected from a fair cross-section of the community and produced a jury that was biased in favor of conviction. We have repeatedly considered and rejected these contentions in other cases. *State v. Byrd,* 676 S.W.2d 494 (Mo. banc 1984); *State v. Preston,* 673 S.W.2d 1, 9 (Mo. banc 1984); *State v. Guinan,* 665 S.W.2d 325, 329–30 (Mo. banc 1984); *State v. Blair, supra, at* 752 (Mo. banc 1982) *State v. Mercer,* 618 S.W.2d 1, 7 (Mo. Banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). Appellant also assigns error to the trial court's refusal to order sequestration of the venirepersons during the "Witherspooning" phase of jury selection. He avers that nonsequestration produced a jury that was biased in favor of the prosecution. We addressed this issue in *State v. Guinan, supra,* at 329, and, for the reasons stated therein, appellant's point is denied.

## V

Appellant next assigns error to the trial court's failure to declare a mistrial sua sponte because of the prosecutor's conduct in examining Albert Keener, a key witness for the state. Since the point was not raised in appellant's motion for a new trial, we review it under the plain error rule. Rule 29.12(b).

Appellant charges that in a portion of the state's redirect examination of Albert Keener the prosecutor repeatedly ignored the court's rulings and encouraged his witness to ignore the court's rulings in order to implant in the minds of the jury the unfounded impression that he made, solicited or condoned threats on Mr. Keener's life. What appellant fails to say, however,

**2.** Appellant has asked us to review the transcript to determine whether the trial court erred when it struck for cause several venirepersons who expressed objections to the death penalty. These venirepersons include Mary Green, Susan Riggs, Ms. Lawrence, Mr. Fleishman, and Mr. Sander. While we entertain serious doubts as to whether the relevant point in appellant's motion for a new trial was sufficient to preserve the point for appeal, we have undertaken the review. We find no reason to upset the trial court's decision with respect to any of the venirepersons.

is that when defense counsel cross-examined Keener he repeatedly emphasized that Keener had received probation on a pending charge, and clearly implied that the lenient sentence was the *quid pro quo* for Keener's favorable testimony. Defense counsel made highly charged statements like "Isn't it true that Mr. Ankney has intervened on your behalf in return for your testimony today?" and "You help him out and he'll help you out. Is that right?" Consequently, on redirect, in the questioning appellant now disputes, the prosecutor sought to correct this impression by showing that probation had been recommended because Keener's life was believed to be endangered due to his role as an informant in this case.

■■■ Taking into account defense counsel's strident cross-examination of Keener, the prosecutor's conduct is beyond reproach. He was entitled to attempt to bolster the credibility of his witness after it had been sharply attacked by defense counsel. This is in accordance with what we said in *State v. Crawford*, 619 S.W.2d 735, 740 (Mo.1981):

> On redirect examination it is proper to examine a witness on any matters which tend to refute, weaken or remove inferences, impressions, implications or suggestions which may have resulted from his testimony on cross-examination, notwithstanding the facts elicited may be prejudicial to the defendant.

The trial court sat in a much better position than we to judge this matter, and we see no basis for saying the court abused its considerable discretion by not declaring a mistrial.

## VI

Appellant filed a supplemental motion for a new trial alleging that new evidence had been discovered that tended to show that Albert Keener's testimony had been motivated by his desire to collect a reward which had been offered by the Onyx Oil Company. He further alleged that the state had withheld disclosure of the fact that the reward had been offered despite his request for discovery and that the newly discovered evidence was so material as to probably produce a different outcome in the case. Appellant now claims the trial court erred in overruling the motion.

■■■ Trial courts have the discretion to grant a new trial because of newly discovered evidence when a defendant proves the following:

> (1) the evidence has come to the knowledge of the defendant since the trial; (2) it was not owing to want of due diligence that it was not discovered sooner; (3) the evidence is so material that it would probably produce a different result on a new trial; and (4) it is not cumulative only or merely impeaching the credit of the witness.

*State v. Williams*, 652 S.W.2d 102, 114 (Mo. banc 1983), *citing State v. Taylor*, 589 S.W.2d 302, 305 (Mo. banc 1979). Appellant's motion was deficient in several respects. The allegation that Keener was out to convict appellant in order to collect the reward loses much of its force when one considers that he first contacted the police regarding appellant's whereabouts and arranged for the arrest long before he learned of the reward. But even if the reward induced Keener's cooperation with the state, disclosure of this fact to the jury would have only served to impeach his credibility. It falls far short of being evidence which in all probability would produce a different result on retrial.

■■■ Appellant also suggests that he is entitled to a new trial because the fact that a reward had been offered was not disclosed by the state during discovery. Even if we assume that this matter falls under appellant's general request for "any ... information, within the possession of the State, which tends to negate the guilt of the defendant," the information clearly does not rise to the level of creating a "reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). The trial court properly denied the motion.

## VII

We now turn to our statutorily mandated duty to review independently the sentence imposed by the jury. § 565.014.3, RSMo 1978. Appellant's remaining points are addressed herein.

▮ The record before us contains no substantial evidence that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. § 565.014.3(1). The trial judge reported that the case received extensive publicity in the community but that, in her opinion, the jury had not been persuaded by outside influences. We note that appellant's trial was held eight months after the offense occurred. Racial prejudice surely was not a factor in this case since both appellant and the victim are white. Members of appellant's race also served on the jury. Appellant contends that the death penalty is applied in a discriminatory manner based on the race of the defendant and the race of the victim. The fact that appellant and the victim are of the same race renders appellant's contention somewhat confusing and patently misplaced in the current context. We believe the trial judge was correct when she observed that the jury's decision to impose the death sentence arose from evidence of planning and premeditation, the age of appellant in relation to the victim, the position in which the victim was found and the location of the gun shots to the victim. We reject appellant's assertion that the death penalty constitutes cruel and unusual punishment and is unnecessarily excessive to promote any legitimate government interest. *See State v. Laws*, 661 S.W.2d 526, 531–32 (Mo. banc 1983); *State v. Williams, supra*, at 112; *State v. Smith, supra*, at 430–31.

▮ The trial court submitted to the jury two aggravating circumstances and the jury cited both of them when it returned its sentence. The circumstances were: (1) that defendant murdered the victim for the purpose of receiving money or any other thing of monetary value, and (2) that defendant murdered the victim for the purpose of avoiding lawful arrest. Though appellant argues that the circumstances are neither applicable to the facts of this case nor supported by the evidence, we need only determine whether, as a matter of law and fact, one of the aggravating circumstances is applicable. *State v. LaRette*, 648 S.W.2d 96, 102 (Mo. banc), *cert. denied*, — U.S —, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. Mercer, supra*, at 10 n. 5. *See also Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

▮ We held in *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983) that the aggravating circumstance of committing murder for the purpose of receiving money or any other thing of monetary value was intended to authorize the death penalty in cases, like this one, where the murder was committed in the course of a robbery. Appellant has asked us to overrule *State v. McDonald* but we remain convinced that our interpretation of § 565.012.2(4) in *McDonald* is both reasonable and correct. We also believe there was an abundance of evidence supporting the submission of the first aggravating circumstance. The jury reasonably could have believed that the murder of the victim was an integral step in appellant's planned robbery of the station.

▮ Finally, we must consider whether the sentence imposed is excessive or disproportionate to the penalty assessed in similar cases, considering both the crime and the defendant. § 565.014.3(3). The record shows that appellant is thirty-eight years of age, single, with a tenth grade education and an IQ range of 70 to 100. He has a poor work record and a history of alcohol abuse. On the other hand, he has a limited criminal record, having pleaded guilty to promoting pornography in 1979, for which he was placed on probation for one year. Five mitigating circumstances were submitted to the jury: the defendant has no significant history of prior criminal activity; the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;

the defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor; the defendant acted under extreme duress or under the substantial domination of another person; and the capacity of the defendant to appreciate the criminality of his conduct to the requirements of law was substantially impaired. Appellant contends the jury gave insufficient consideration to the mitigating circumstances, but we are not prepared to say that this is so. While the trial court appears to have prudently submitted any mitigating circumstance that had any basis, however tenuous, our independent review of the record and reports before us convinces us that only the first mitigating circumstance—that defendant had no significant criminal history—warrants serious consideration. It is argued that "[t]he execution of the appellant would stand for the belief that no human life is worth any more than a single grievous transgression." We believe the human spirit by its nature is forgiving, but planned acts of violence as senseless and vile as that inflicted by appellant upon his adolescent victim warrant exaction of the ultimate penalty. We have affirmed the death sentence in other cases in which this mitigating circumstance was raised and where the killing was equally unnecessary. *State v. McDonald, supra; State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *State v. Blair, supra.*

We have reviewed the capital cases similar to the instant one where both death and life imprisonment were submitted to the jury and we conclude that appellant's sentence was neither disproportionate nor excessive. We cite particular attention to *State v. McDonald, supra;* and *State v. Newlon,* 627 S.W.2d 606 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). Appellant has cited a number of cases in which the jury recommended life imprisonment, but only in one of these cases was the death penalty an option for the jury. In that case, *State v. Davis,* 653 S.W.2d 167 (Mo. banc 1983), the defendant shot and killed a police officer investigating a report that the defendant was flourishing a weapon outside a tavern. There was considerable evidence that the defendant had a twenty year history of alcoholism and that he was under the influence of alcohol and prescriptive drugs at the time of the shooting. In the case before us, alcohol appears not to have been a substantial factor. *Davis* is further distinguished by the fact that the killing did not occur in the course of a robbery. Having reviewed the entire record, the reports prepared for us, and the records of our earlier capital cases, and having considered the nature of appellant's offense and the circumstances under which it was committed, we are left with the firm conviction that the death sentence was justly imposed.

The judgment is affirmed.

All concur.