**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Carol Jean KLAUS,
Defendant-Appellant.**

No. 51290.

Missouri Court of Appeals,
Eastern District.

May 12, 1987.

Rehearing Denied June 9, 1987.

Robert B. Ramsey, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Presiding Judge.

Defendant, Carol Jean Klaus, appeals her convictions on one count each of second degree murder, in violation of Section 565.-021 RSMo 1986, and armed criminal action, in violation of Section 571.015 RSMo 1986. She was sentenced to twenty-five years on the second degree murder count and three years on the armed criminal action count; the sentences to be served consecutively. The victim was defendant's former husband, Richard Klaus [Richard], a Pine Lawn[1] police officer.

On appeal, defendant alleges that the trial court erred in five respects. Defendant's first contention is that the trial court erred in submitting the case to the jury because the state failed to prove defendant

intended to murder Richard or that her actions were the cause of his death. Secondly, defendant contends that the trial court erred in refusing to allow David Guckas, a family therapist who had worked with both the defendant and Richard to testify that Richard had admitted to him that he had threatened and harassed defendant, and was trying to "drive her crazy." The victim's statements were, according to the offer of proof, made only shortly before the incident which gave rise to the charges on which defendant was convicted.

Defendant next argues that the trial court erred in failing to award her a new trial because of prosecutorial misconduct. She alleges that the prosecutor allowed false and misleading testimony to stand uncontradicted. She also alleges that the prosecutor failed to provide her attorney with exculpatory information and that the prosecutor argued improperly in closing argument.

Defendant fourthly contends that the trial court abused its discretion in finding no prejudice and therefore failing to order a new trial where a juror had spoken to a spectator once during the trial. Finally, defendant argues that the trial court abused its discretion in failing to grant a new trial on the basis of newly discovered evidence that was presented or offered to the trial court at the time of the hearing on defendant's motion for a new trial. We affirm the judgment of the trial court.

In addressing defendant's first point on appeal, we note

[i]n assessing the sufficiency of the evidence, we must accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. Our inquiry is limited to whether the evidence, viewed in the light most favorable to the state, is sufficient to support the verdict.

*State v. Bolder*, 635 S.W.2d 673, 679 (Mo. banc 1982) (citations omitted).

Defendant and Richard were divorced in 1985. The couple had three children; a twelve year old daughter, and a teenage

---

**1.** Pine Lawn is a municipality within St. Louis County.

daughter and son who were born to defendant's previous marriage, but had been adopted by Richard. After the divorce, pursuant to a custody agreement between the parties, defendant had custody of the teenage daughter. The other two children were in Richard's custody.

All three children, however, spent Christmas with their mother. On December 28, 1985, all three of the children were still with the defendant. Maureen Leach, a friend of defendant's at the time of the events herein, testified that on December 28, defendant informed her that Richard was willing to give her permanent custody of both the younger daughter and the son and she was making the arrangements for the custody change.

On New Year's Eve, defendant told Leach that she was concerned about the possibility that Richard might change his mind about relinquishing custody. On January 2, 1986, defendant reported to Leach that she had spoken to an attorney. She also told Leach that she had called Richard to inform him that the attorney had stated that if all three of the children were living with her, the court would order Richard to make some type of child support payments. She indicated that Richard was angry about that fact and had told her that she had "screwed up."

Defendant called back later and told Leach that Richard was coming after the two children over whom he had legal custody. Later, she called Leach a third time and asked her to keep the oldest daughter, who was in defendant's legal custody, while she took the other two children to South Dakota where her parents and sister lived.

Defendant returned from South Dakota on January 6, 1986. On January 7, she told Leach that she had spoken to her attorney and he had advised her to return the children to Richard. Leach testified that during this conversation, defendant stated that she was "fed up with things" and that she "couldn't take it any more." Leach also testified that defendant told her then that she was going to run over Richard with her car and that she was going to hide her identification before she did so.

On January 8, 1986, Richard and his girlfriend, Marie Harris went to the St. Charles County Prosecutor's Office to obtain a warrant for defendant's arrest on the basis of her interference with child custody. The two had gone to pick up the children on January 2, and had found no one home. Marie Harris testified that they visited the house approximately every other night between the second and the eighth and never found anyone home. She also testified that Richard had called the children's schools and had been informed that they had not been in school since the Christmas/New Year's break. On the eighth, after obtaining a promise that a warrant would be sought, Richard drove to the St. Charles house in another attempt to find defendant.

Defendant and the older daughter intended to stay at Maureen Leach's house, but on the eighth, they went back to their house to pick up a few things. While they were there Richard and Marie Harris came by, checking to see if anyone was home. Defendant and the daughter hid until they thought that Richard and Harris had given up and left. They then left, but defendant sighted Richard's car in the rearview mirror and according to her testimony tried to out run him. She pulled into River Bend Estates a subdivision under construction in her neighborhood, allegedly because her daughter had indicated that it was connected to a highway on the other side. Richard followed her into the subdivision. The street that she had turned on, according to her testimony, deadended and when she turned around, Richard's car was across the road.

Defendant told her daughter to exit the car and run. Defendant gave her a glass containing some type of liquid and told her to throw the contents at him and then run if he started to follow her.

Richard's car door was open and he was standing in the door when defendant turned around, and he allegedly motioned to her and called to her requesting that she get out of the car and talk to him. Marie

Harris testified that defendant then stated that she had previously warned Richard that the next time she saw him she would kill him. Defendant denied that statement. Harris testified that Richard had put in a call before to his Pine Lawn police dispatcher, requesting that his dispatcher inform the St. Charles County Police that he needed assistance. When Richard reached for the radio to respond to a message in response to that first call, defendant, according to Harris' testimony, gunned the motor on her car and drove into the driver's side of Richard's car, where he was standing outside the door, at approximately fifty miles per hour. The door fell on the back of Richard's leg partially severing the leg.

Defendant then stopped, exited her vehicle and walked over to where Richard was laying on the ground. Defendant then went back to her car and returned with a butcher knife, with which she attempted to stab Richard numerous times. He suffered several lacerations before subdivision construction workers, who had heard the commotion, and Marie Harris were able to get the knife away from her.

Defendant then returned to her car and twice attempted to run over Richard again before leaving the subdivision. However, the construction workers were able to get Richard off to the side of the road.

Defendant left the subdivision alone, returned home and called Leach. Leach testified that defendant was anxious, but not hysterical. She asked Leach to find her daughter and to get her an attorney because she had just run over Richard. That call was made before 3:00 p.m. At about 3:00 p.m. or shortly after that, defendant called the St. Charles police. She failed to tell the officers where Richard was, but requested that they come to her home.

Defendant did not have her purse, or any identification with her when she was arrested. She later told Maureen Leach that it was under the couch and Leach then retrieved it for her, while she was in jail awaiting trial.

Richard was taken first to St. Joseph's Hospital in St. Charles and was then trans-ferred immediately to St. Louis University Hospital. Surgery was done in an attempt to save the leg. On January 15, however, the doctors determined that amputation was necessary and on January 16, the amputation was performed. The injury had, however, caused a blood clot to form in Richard's leg and unknown to the doctors, a piece of that clot had broken off and on January 25, that clot reached Richard's heart. He died of a cardiac arrest as a result of the clot.

Defendant pled self-defense and defense of another. She alleged that she had been a battered wife and that since the divorce Richard had harassed her. She testified that when she saw that the road was blocked and he was waiting for her, she believed her own life and that of her daughter were in danger unless she "stopped" Richard.

■ Accepting the state's evidence and all reasonable inferences from that evidence, as we must, it is hard to imagine a clearer case of intent to kill or cause serious physical injury under the meaning of those terms as they are used in Section 565.021 RSMo, the second degree murder statute, and there is little doubt that she used a dangerous or deadly weapon, under the terms of 571.015 RSMo.

■ Defendant argues that she acted under extreme emotional disturbance and was incapable of forming the necessary intent. However, that question was for the trier of fact which resolved it against defendant. Defendant did not simply run over Richard once. She got out of her car and attempted, by her own admission, to stab him in the chest. When the knife was taken away from her, she attempted to back up and run over him again. The use of a deadly weapon, and in this case both the car and the knife could properly be classified as deadly weapons, in such a manner that a vital part of the victim's body is likely to be injured is sufficient to permit a finding of intent to kill. *State v. Bolder*, 635 S.W.2d 673, 680 (Mo. banc 1982).

■ Defendant also argues that there was insufficient evidence that her actions,

and not poor medical care, caused Richard's death.[2] She points out that Richard did not die until January 25, 1986, and that the cause of death was cardiac arrest. Whether or not a death is immediate, however, a defendant who intended to kill or cause serious physical injury to another person is legally accountable for the death of that person, "if the direct or immediate cause of death [in this case the cardiac arrest and the blood clot that caused it] resulted naturally or proximately from his own unlawful act." *State v. Williams*, 652 S.W.2d 102, 111 (Mo. banc 1983).

The state's evidence certainly did not foreclose the possibility that had Richard's leg been amputated immediately the blood clot would not have had time to break off and enter his bloodstream and he would not have died. The state's evidence also did not foreclose the possibility that anticoagulent drugs would have prevented the clot from reaching Richard's heart. However, while the defendant did present medical testimony that these possibilities existed, there was no evidence that any of the medical personnel who treated Richard were negligent. There was evidence from the treating physicians and the medical examiner that the blood clot resulted naturally and proximately from the damage to Richard's leg done by defendant's vehicle. In *State v. Bolder, supra*, 635 S.W.2d at 680, the Missouri Supreme Court stated: "It makes no difference that King [the victim] died from an infection resulting from the stabbing rather than from the stabbing itself. Appellant nevertheless is legally responsible." A similar situation is present in the case *sub judice*. There was certainly substantial evidence to support the jury's finding that defendant's actions caused the clotting and the clotting was the direct cause of Richard's death. Therefore, defendant is legally responsible, and any argument to the contrary is devoid of merit.

■ Defendant next argues that the trial court erred in failing to allow David Guckas, a family therapist who had worked with the Klaus family, to testify that Richard had admitted to him once that he was harassing defendant. At trial, defendant's counsel asserted the statements were admissible as statement's against the victim's penal interest. It is well established that admission by a party opponent against his own interest is admissible when offered against him. *See State v. Walls*, 637 S.W.2d 812, 813 (Mo.App.1982). However, defendant has failed to cite this court to any authority for the proposition that admissions against interest made by the victim are admissible in a criminal trial. Independent research has also failed to uncover any such authority and the argument is without merit.

■ Defendant also argues, however, that the testimony was admissible to show either defendant's state of mind or that of the victim. When out of court statements are admitted to establish state of mind, however, they are not being admitted for the truth of the matters asserted, but only for the fact that the statements were made. Therefore, the statements have no probative value on the issue of whether defendant was actually being harassed. The testimony was irrelevant as to defendant's state of mind unless defendant knew about the statements. Guckas indicated that the statements were not made in defendant's presence and defense counsel's narrative offer of proof failed to indicate defendant's knowledge of the statements. The testimony was therefore not admissible as circumstantial evidence of defendant's state of mind.

■ Defendant is correct that statements indicating the victim's state of mind are admissible if they are relevant to an issue in the case. *State v. Ford*, 639 S.W.2d 573, 574 (Mo.1982); *State v. Singh*, 586 S.W.2d 410, 418 (Mo.App.1979). Thus, if Richard's mental state was relevant to the issue of self-defense and if the statements made to Guckas were relevant to Richard's mental state on January 8, 1986, they were admissible.

---

2. Note that even if this point had merit, it would relate only to the second degree murder conviction and not the armed criminal action conviction since death is not an element of the crime of armed criminal action.

We note first, however, that there is no indication of how close to January 8, 1986, the statements were made to Guckas. There was no dispute as to the fact that the initial aggressor was defendant. Defendant's claim of self-defense or defense of another, her daughter, hinged on whether defendant *reasonably* believed that her actions were necessary to protect herself or her daughter. We determine that there is no relevance of the statements Richard allegedly made to Guckas.

Defendant also alleges that the statements were admissible to show the state's witness Marie Harris' ill feelings toward her. Since there was no evidence that Harris was present, this argument has no merit.

Defendant's counsel's offer of proof failed to demonstrate either that the statements were evidence of the victim's mental state on the relevant day or that his mental state was relevant to the issues before the fact finder. There was a risk that the statements, if admitted, would have been prejudicial. We conclude that the trial court did not abuse its discretion in refusing to admit the statements.

We next address defendant's allegation that a new trial was warranted because of prosecutorial misconduct and that the trial court abused its discretion in denying the motion for new trial. Defendant contends the prosecutor allowed its witness, Maureen Leach, to give false, erroneous and misleading testimony without making any effort to correct the testimony and that the prosecutor failed, during discovery, to reveal information that could have been used to impeach Maureen Leach. Defendant also alleges that the prosecutor acted improperly in falsely stating in closing argument that Maureen Leach had been consistent in her statements throughout the proceeding.

Defendant further argues that the prosecutor engaged in other improper and prejudicial final arguments. The second prosecutorial argument defendant alleges was improper, was the state's accusation that defendant's attorney had engaged in improper tactics to draw the jury's attention away from the central issue of guilt or innocence and onto the prosecutor and his actions. The third allegedly improper charge was a statement that defendant had fabricated her testimony of abuse. During the latter part of his argument, the prosecutor also indicated that defendant had made no statements about alleged abuse when she was first taken into custody. Defendant contends that this was a comment on post-arrest silence. Finally, defendant argues the prosecutor mischaracterized the law to defendant's prejudice by stating that in determining whether defendant had acted in self-defense, a "reasonable man standard" is appropriate. We address each of these allegations in order.

As mentioned earlier, Maureen Leach testified at trial that the day before defendant ran over Richard, she had told Leach that she intended to run over him and she intended not to have any identification on her when she did so. The following answers by Leach on cross-examination contain the allegedly false and misleading testimony:

Q (By Mr. Ramsey) Now, you just came up with this story last week about Carol planning, she had it all planned out and she was going to run over Richard with a car. You just came up with that last week and told Mr. Dalton about it last week, did you not?

A No.

Q So if Mr. Dalton had told me last week when I was inquiring about what you were going to say that you had just come up last week with a brand new statement about this, that would be wrong?

A Yes, you would be wrong.

Q Who is wrong, Mr. Dalton or myself?

A Could you rephrase—go over that question again so I understand how I'm answering this?

Q So if Mr. Dalton told me last week, or at least told my investigator, Nat Helms, last week that last week for the first time you came up with a brand new version of the story for the first time last week, that wouldn't be right?

A No, that wouldn't be correct.

Q You didn't come up with anything new last week?

A I don't think I did, I don't recall.

Q Well, correct me if I'm mistaken, was it last week or the week before last?

A On what are we talking about?

Q About coming out with additions to the story that were not in the written statement you gave the police?

A I talked a lot about this before this. This was nothing new. After preliminaries is when I started talking to Mr. Dalton.

Defendant contends that this testimony was misleading or false and that the prosecutor knew of this fact. She contends the prosecutor told her investigator that Leach told him of the specific threat and the plan not to carry any identification only the day before this revelation allegedly took place a week before trial. Defendant deduces from the above testimony that Leach had told the prosecutor about what defendant said much earlier in the proceedings and his failure to tell the defendant was misconduct.

 A fair reading of the record does not reflect that Leach testified falsely or that she attempted to mislead the jury. Because the record does not reflect that the testimony was false or misleading, the prosecutor was certainly not under any duty to correct or clarify the testimony. There is thus no basis for a finding that his failure to do so constituted prosecutorial misconduct. We find that Leach's testimony was consistent and the court did not abuse its discretion in not declaring a mistrial.

With regard to defendant's second allegation of prosecutorial misconduct, i.e. that the prosecutor failed to disclose information in discovery which could have been used to impeach witness Leach, we note that no specific undisclosed information that could have been used for impeachment purposes is pointed out. Instead, defendant's counsel, in his brief, states only that "[t]he failure to disclose took the form of the prosecutor failing to produce Ms. Leach for a deposition."

Leach was originally endorsed by both the state and the defendant. The prosecutor, at the hearing on the motion for a new trial indicated that he had talked to Leach on numerous occasions, but that she had moved around some and it was she who called him. According to his testimony, he did know where she was some of the time while this matter was pending, but at other times he did not know where she was. There was no indication that the prosecutor ever refused to disclose Leach's whereabouts in an attempt to keep her from being subpoened for a deposition or that he ever made false statements concerning his knowledge of her whereabouts.

 Defendant has failed to demonstrate that the prosecutor violated any of the rules of discovery or that he committed misconduct by attempting to prevent defense counsel from deposing Leach. However, even if defense counsel had demonstrated that the rules of discovery were violated, the question of whether or not to apply sanctions was within the sound discretion of the trial court. This court will intervene only where a defendant demonstrates that the state's failure to disclose discoverable information resulted in fundamental unfairness. *State v. Bizzle*, 608 S.W.2d 111, 113 (Mo.App.1980). After examining the record we find neither misconduct or fundamental unfairness.

We next examine defendant's allegations concerning the impropriety of the state's closing argument. The remarks which defendant states impugned his counsel's tactics and thereby prejudiced him are as follows:

> One of the things I want to point out is a common defense tactic used in this case. When you don't have a whole lot of evidence, what you do is try to bring in a lot of different matters and you try to bring them in in an incorrect manner. Things he knows are inadmissible things. He knows he cannot win with a particular witness and makes the Prosecutor object to things. If he can do that enough, well, the Prosecutor is trying to hide something. I wasn't trying to hide

the tape. He just wasn't trying to bring it in correctly. I wanted to wait until he could get a witness on the stand to testify about it.

When he tried to bring it in with the defendant, I did not object because there is a person on the stand we can talk about this tape with. He knows the proper procedure, he knows what's admissible.

At trial defendant's counsel did not object to these statements, but instead waited until the filing of the motion for a new trial to bring the alleged prejudicial nature of this argument to the trial court's attention.

■ Defendant also failed to supply this court with a transcript of her own counsel's closing argument so it is impossible for this court to determine whether the state's argument was an attack itself[3] or simply a rebuttal to a suggestion by defense counsel that the state was trying to hide something. It is defendant's duty to supply this court with a complete record on appeal. *State v. Tatum,* 656 S.W.2d 305, 308 (Mo.App.1983).

> Trial courts are:
>
> vested with broad discretion in controlling closing argument of counsel. Substantial latitude is allowed in summation, and when manifest injustice is the standard of review [as in the case sub judice], Rule 29.12(b), improper argument will justify reversal only if its effect is decisive on the jury's determination; and the defendant is saddled with the burden of demonstrating such effect.

*State v. Wren,* 643 S.W.2d 800, 802 (Mo. 1983). This defendant has failed to carry that burden.

Defendant's next contention with regard to improper argument involves the following remarks by the prosecutor:

> This defense, whole defense is fabricated. At the time she was arrested she didn't tell any of the officers anything about abuse or self-defense or, "I had to do it," or anything like that.

Defense counsel did object to this argument and did request a mistrial. The trial court overruled the objection.

■ "The general rule is that counsel may properly comment in closing argument on matters in evidence and may draw inferences from the evidence." *State v. Treadway,* 558 S.W.2d 646, 650 (Mo. banc 1977), *cert. denied* 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978).

■ Maureen Leach, defendant's only friend to testify, and apparently from the evidence a close confidant, testified that defendant had specifically told her that she was not being abused. A reasonable inference therefore may have arisen that the story of abuse and fear was fabricated.

Defendant does assert correctly that she had the right to remain silent at the time of her arrest without fear that her silence would be used against her at trial. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Powell,* 682 S.W.2d 112, 114 (Mo.App.1984). "If, however, the defendant answers questions or makes a statement while in custody, the right to remain silent and not have the state comment on that silence is waived as to the subject matter of those statements." *State v. Crow,* 728 S.W.2d 229 (Mo.App. E.D., 1987), citing *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980); and *State v. Lindsay,* 709 S.W.2d 499, 509 (Mo.App.1986).

Defendant did not remain silent at the time of her arrest. She made an oral statement, instead, relating to what happened as having been an accident. Her testimony contradicted that statement and the state did not act improperly in commenting on the fact that her original statement made no mention of self-defense.

Defendant's final contention concerning prosecutorial misconduct was not preserved for our review and we will not address it.

---

**3.** This argument was made during the second half of the state's closing argument, following defense counsel's argument.

Defendant next contends that the trial court abused its discretion in finding no prejudice and therefore denying her a new trial where a juror had engaged in conversation with one of the spectators at the trial. When a juror engages in an unpermitted communication with a third person which is related to the cause being heard, it is the state's burden to demonstrate that the juror was not improperly influenced. *State v. Martin*, 624 S.W.2d 879, 882 (Mo.App.1981); *State v. Quinn*, 405 S.W.2d 895, 896 (Mo.1966).

The trial court, however, is the court which hears the evidence concerning the allegedly improper contact and it is in the best position to determine the credibility of that evidence and the intent of the parties. The trial court is thus vested with broad discretion in determining whether the state has demonstrated the harmlessness of the contact. *State v. Carr*, 610 S.W.2d 296, 300 (Mo.App.1980).

In the case *sub judice*, defendant presented the testimony of Mary Agular, a spectator who was involved in the alleged improper contact. Agular testified that during a recess at some point in the trial, one of the women jurors had approached her and a friend and asked if they were students. Agular testified that her friends said nothing, and that she replied by stating only "No. We're with Women Rising in Resistance and we're here to see the case for Carol Klaus." The juror then turned, allegedly sighed, shook her head, and walked away. Agular was the only witness called by either side with respect to this issue. Her testimony indicated that no substantive issue was discussed and no comments on the evidence were made. We find no error in the trial court's finding that the contact was harmless and does not warrant a new trial.

In defendant's fifth and final point relied on she asserts the trial court erred in not granting a new trial based on newly discovered evidence.

The decision on whether to grant a new trial on the basis of newly discovered evidence is left to the sound discretion of the trial court which heard the evidence and any testimony at the motion for a new trial concerning the newly discovered evidence. We review only for abuse of that discretion.

In making the decision as to whether a new trial is mandated, the trial court examines the evidence before it and makes a determination as to whether the defendant has shown: 1) that the evidence has come to the knowledge of the defendant since the trial; 2) that it was not due to any lack of diligence on the part of defendant or his/her counsel that the evidence was not discovered earlier; 3) that the evidence is so material that it would probably produce a different result on retrial; and 4) that the evidence is not cumulative or merely relevant as impeachment of the credibility of a particular witness. *See, State v. Johns*, 679 S.W.2d 253, 266 (Mo. banc 1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *State v. Coleman*, 660 S.W.2d 201, 221 (Mo.App. 1983). Unless all four criteria have been met, a new trial is not mandated.

The newly discovered evidence presented by defendant consisted of the testimony of three employees of Richard's Bank, the testimony of Denise Fondren, an employee of the Jane Crider Mental Health Center in St. Charles, where defendant was once treated, and pursuant to defendant's addendum to her motion for a new trial, an affidavit of Ms. Willie Woodbury. The addendum was not timely filed and therefore at the outset of the hearing on the new trial motion, the trial court sustained the state's motion to strike the addendum.

In her argument, defendant has requested a review of whether the addendum and the affidavit attached thereto were improperly stricken. We need not, however, reach that issue. The addendum and the affidavit are included in the legal file and we have reviewed both.

The affidavit asserts that Maureen Leach was not telling the truth when she testified that defendant had never said anything to her about being abused and that according to what Leach had told Woodbury, certain unnamed Pine Lawn Po-

lice Officers had instructed Leach to remain quiet. The affidavit also contained a reference to an Officer Bommarito who allegedly told Woodbury that Pine Lawn Police had searched the St. Charles house and recovered some notes. With respect to the statements in the affidavit which tend to impeach Leach, we need only note that impeachment evidence is not the type of newly discovered evidence which warrants a new trial. *State v. Johns, supra,* 679 S.W.2d at 253; *State v. Coleman,* 660 S.W.2d at 221. Regarding the statements allegedly made to Woodbury by Officer Bommarito, we observe that the statements were inadmissible hearsay and no showing was made that any notes which were found were material.

Defendant concedes this, but contends that the testimony was relevant to the issue of prosecutorial misconduct. We see no such relevance.

The three employees of Normandy Bank, Richard's bank, testified that he had come into the bank on January 7, the day before the incident to make his car loan payment. All three testified that he was angry because defendant had allegedly "stolen" his children and that he turned on his way out and stated that when he found defendant he would "fix her" so that she could not take the children again. They also testified that they had not come forward earlier because they did not know enough about the case to know their testimony might be relevant until they heard about the trial on the television news. All three testified, however, that Richard came in every month at about that time to make his car payments. The first question here is whether with due diligence these witnesses would not have been discovered before trial and called at trial. The second question is whether their testimony was so material that it would have had the likely effect of changing the outcome of the trial.

When a defendant in a murder trial relies on self-defense and reasonable fear, the victim's recent actions and statements may be quite relevant. It is the duty of defendant and her counsel to use due diligence in investigating her defense and if they fail to do so, and helpful evidence turns up later, a new trial is not warranted. Defendant was aware of where Richard banked. There is no indication that she did not know of his usual habit of making his car payments in person during the early part of the month. Defendant has failed to demonstrate that with due diligence, she and her attorney could not have properly investigated Richard's statements and actions at least for the two or three days preceding the events which caused his death.

If defendant believed that evidence of the type presented by these three witnesses was material and had the potential to change the outcome of the trial, she could have done that type of investigation.

We also note that there were witnesses to the actual events in the River Bend Subdivision and there was testimony concerning Richard's actions at the scene. Therefore, the materiality of the testimony by the bank employees is highly questionable in the case *sub judice.*

Finally, we address the testimony of Denise Fondren to the effect that the records at the Jane Crider Mental Health Center reflected that sometime prior to 1983, defendant had been treated at the center and during treatments she had complained of spousal abuse. Defendant was the patient. She makes no argument as to why the evidence of her medical records and her statements to personnel at the center did not become available until after the trial, except to state that she forgot about her treatment at the center. Defendant has failed to demonstrate that it was not because of any lack of due diligence on her part that the evidence at issue here was not presented at trial.

We find no abuse of the trial court's discretion in failing to award a new trial on the basis of newly discovered evidence.

The judgment is affirmed.

CRANDALL and KAROHL, JJ., concur.