**STATE of Missouri, Respondent,**

v.

**Michael G. ALBANESE, Appellant.**

**No. WD 55524.**

Missouri Court of Appeals,
Western District.

Dec. 21, 1999.

Rehearing Denied Feb. 1, 2000.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

John P. O'Connor, Kansas City, for appellant.

## PER CURIAM.

Michael G. Albanese appeals the judgment of his jury conviction in the Circuit Court of Platte County for felony murder in the second degree, § 565.021.1(2),[1] for which he was sentenced to life imprisonment.

The appellant asserts three points in his appeal. In Point I, he claims that the trial court erred in overruling his motion for a new trial because his constitutional right to due process was violated by the State: (1) intentionally suppressing favorable and material information which he requested pursuant to Rule 25.03(C)[2] and was required to be disclosed under the rule and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2) knowingly obtaining a conviction based on perjured testimony. In Point II, the appellant claims that the trial court erred in overruling his motions for a mistrial because the State violated, in three instances, its order *in limine.* In Point III, the appellant claims the trial court plainly erred in not declaring a mistrial, *sua sponte,* because the assistant prosecutor made several improper references in her closing argument to her belief in the appellant's guilt.

We affirm.

### Factual Background

In 1996, Ferrell Travis Riley (Mr. Riley) was convicted of racketeering; sentenced to nine years incarceration in a federal penitentiary; and ordered to forfeit $28 million in assets he and his girlfriend had fraudulently acquired, including a large amount of personal property acquired through a criminal enterprise, including items such as rugs, sculptures, and statues. Despite the forfeiture order, the federal government was unable to obtain possession of the items. As a result, the Federal Bureau of Investigation (FBI) be-

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

2. All rule references are to the Missouri Rules of Criminal Procedure (1997), unless otherwise indicated.

gan surveillance on Mr. Riley's youngest son, Joseph Riley (Riley), in an attempt to locate the items. The FBI believed that Mr. Riley was continuing his fraudulent activities through his son, who was president of a Kansas City-area company that Mr. Riley had formed.

During the FBI investigation of Riley, agents discovered that Joseph Bartels (Bartels), a paid FBI informant, lived next door to Riley. The FBI asked Bartels to get to know Riley and look for evidence of the missing items. Bartels subsequently befriended Riley, telling him that he worked for a Chicago drug dealer. As a result of his friendship with Riley, Bartels met Nicholas LanFranca (LanFranca). At times, Riley discussed with Bartels "ripping off" and "whacking" drug dealers. Riley also talked about killing drug dealers in the presence of LanFranca.

In January 1997, Riley told Bartels he would be willing to sell him two items that were ordered forfeited by his father, a player piano and an Indian bronze statue. The FBI encouraged Bartels to pursue the purchase of the items. Several days after their conversation about the sale of the piano and statue, Riley called Bartels and asked if he could buy some cocaine through the Chicago drug dealer. Riley said he wanted the cocaine for a friend. After consulting with the FBI, Bartels offered to sell the drugs to Riley. Riley met with the appellant on January 23, 1997, the same day he said he had someone ready to buy the drugs from Bartels.

On January 26, 1997, Bartels confirmed the buy with Riley, who said his friend wanted to buy all the cocaine that was available. Bartels told Riley he was going out of town and would contact Riley when he arrived back in the Kansas City area with the drugs. During the days Bartels was supposed to be in Chicago, the FBI rented two adjoining hotel rooms in a Kansas City Motel 6 next to Interstate 29. FBI agents modified the room where the drug deal was to take place so they could record the transaction. The FBI planned

to have agents stationed both inside and outside the motel and, immediately after the exchange, to arrest Riley and whomever accompanied him.

On January 30, 1997, the FBI began surveillance on Riley, at which time Bartels called Riley to tell him the sale would take place that day. Soon thereafter, Riley called the appellant, then drove to the appellant's home and picked him up. Riley and the appellant joined a woman and LanFranca for lunch at Mr. Riley's restaurant, where Riley received a page from Bartels. Riley called Bartels, who told him to come alone to the Motel 6 to complete the drug deal. Shortly thereafter, Riley and the appellant drove around, were paged again, then returned to call Bartels at the restaurant, where a conversation about acquiring a gun took place with LanFranca.

Riley and the appellant left the restaurant and drove north toward the Motel 6. On the way, they stopped at a pay phone to call Bartels. Both Riley and LanFranca listened to the phone conversation. Riley then dropped off the appellant nearby and went to meet Bartels at the Motel 6. At the motel, Bartels showed Riley the drugs, and the two discussed the sale. They quibbled about the price, and Riley told Bartels that he would get back with him soon and left.

After Riley left the Motel 6 and picked up the appellant, the two made several stops and telephone calls. They went to LanFranca's residence, talked there for a while, then Riley, the appellant, and LanFranca left and drove toward the Motel 6. They stopped at another restaurant near the motel, where the appellant received a page, made a call, and told the other two that the person he called was "buggin' him for his money" and that "[t]he deal wasn't even done yet." Shortly thereafter, Riley, the appellant, and LanFranca left the restaurant and traveled to the Motel 6.

After reaching the motel, the appellant handed Riley a gun. Riley got out of the

car, and the appellant got behind the wheel while LanFranca moved to the front passenger seat. The appellant drove the car next to the steps that led to Bartels's motel room. Riley entered Bartels's room with the gun concealed and with gloves on his hands. After Bartels closed the door and a few words were spoken, Riley pulled out his gun and began shooting Bartels. Riley's gloves allegedly made firing the revolver difficult, giving FBI agents an opportunity to intervene. An agent came through the door adjoining the two motel rooms and shot Riley. Riley died as a result of the agent's gunshot wounds. FBI agents then ordered law enforcement officers at the scene to arrest the appellant and LanFranca, who were still waiting in the car, with the motor running outside the motel stairs. Law enforcement officers surrounded the car and arrested the two suspects.

### Procedural History

The appellant was indicted on February 27, 1997, and later charged by information in the Circuit Court of Platte County, Missouri, with one count of murder in the second degree. He was charged under the felony-murder provision of § 565.021.1 because Riley was alleged to have been killed as a result of the appellant's attempt to possess a controlled substance under § 195.202. LanFranca was not charged.

Subsequent to LanFranca's arrest as a result of events surrounding Riley's death, the federal government sought to revoke LanFranca's federal probation. At his probation revocation hearing held on March 3, 1997, LanFranca testified for several hours about what occurred on the day of Riley's shooting. He denied any wrongdoing, but his probation was nonetheless revoked. With respect to his involvement in the drug deal gone bad, LanFranca entered into an agreement with the federal government that allowed him to plead guilty to conspiracy to possess five kilograms of cocaine for a reduced sentence, in exchange for his testimony

against the appellant in this case. At the time of the appellant's trial, LanFranca testified that he did not expect to be charged in state court for the events surrounding Riley's death.

Prior to the appellant's trial, his attorney made a written request for discovery pursuant to Rule 25.03(C). In response to this request, the State made certain disclosures that did not include a transcript of Bartels's testimony at LanFranca's revocation hearing. On December 1, 1997, the appellant filed a motion *in limine* to prevent the State, *inter alia,* from mentioning at trial "any statements attributed to Michael Albanese made to Joe Riley (deceased) and reported to the state's witnesses in this case." The trial court sustained the appellant's motion with respect to this issue.

The appellant's jury trial commenced on December 1, 1997. After being instructed and deliberating on a charge of felony murder in the second degree, the jury, on December 4, 1997, found the appellant guilty, as charged. The appellant filed a motion for judgment of acquittal or, in the alternative, for a new trial, which was denied. He was sentenced by the trial court on January 29, 1998, to life imprisonment.

The record reflects that the appellant appealed his conviction to this court on February 9, 1998. On September 16, 1998, the appellant filed a motion in this court to remand the case to the Circuit Court of Platte County for an evidentiary hearing on the State's alleged intentional suppression of material and exculpatory information, specifically, Bartels's testimony given at LanFranca's revocation hearing. The motion was sustained. A hearing was then held in the circuit court on December 9, 1998. On December 23, 1998, the court found that the State did not intentionally suppress any evidence it was required to disclose to the appellant under Rule 25.03(C) and/or *Brady v. Maryland.*

## I.

In Point I, the appellant claims that the trial court erred in overruling his motion for a new trial because his constitutional right to due process was violated by the State: (1) intentionally suppressing favorable and material information which he requested pursuant to Rule 25.03(C) and was required to be disclosed under the rule and *Brady v. Maryland;* and (2) knowingly obtaining a conviction based on perjured testimony. We disagree.

### Standard of Review

■ Our review of a trial court's denial of a motion for a new trial is for an abuse of discretion. *State v. Jackson,* 969 S.W.2d 773, 775 (Mo.App.1998). " 'Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration....' " *Id. (quoting King v. Copp Trucking, Inc.,* 853 S.W.2d 304, 307 (Mo.App.1993) (*citing State ex rel. Webster v. Lehndorff Geneva, Inc.,* 744 S.W.2d 801, 804 (Mo. *banc* 1988))). "Rulings made within the trial court's discretion are presumed correct and the appellant has the burden of showing that the trial court abused its discretion." *Id.*

### Discussion

### A. Brady Violation

In claiming that he is entitled to a new trial based on a discovery violation by the State, the appellant contends that, pursuant to Rule 25.03(C) [3] and *Brady,* the State was required to furnish to the defense, as part of its pretrial discovery under the rule, a transcript of Bartels's testimony during the federal probation revocation hearing of LanFranca (the revocation hearing). Bartels testified, in pertinent part, at the revocation hearing that Riley, in the presence of LanFranca, had discussed with Bartels "ripping off a drug dealer" and had asked if he "knew of anybody that they could do." LanFranca testified at the appellant's trial that he did not recall being present during any such discussions between Riley and Bartels, but admitted that he had heard Riley make such statements. He also admitted that he knew of Riley's intention to steal from Bartels at the Motel 6 and was involved in the plan. This testimony conflicted with Bartels's testimony at trial that LanFranca was not present during any such discussions. Bartels, when confronted at trial with the FBI report, which stated that LanFranca was present, testified that he had lied to the FBI. The appellant argues that Bartels's testimony at the revocation hearing was favorable and material to his defense on the felony-murder charge against him because it could have been used to: (1) impeach both Bartels and LanFranca, the principal witnesses on which the State relied to convict; and (2) corroborate the defense's theory that LanFranca, not the appellant, was aware of Riley's plan to steal Bartels's drugs and murder him, such that the outcome of his case would have been different. We disagree.

**3.** Rule 25.03(C) provides:
> If the defense in its request designates material or information which would be discoverable under this Rule if in the possession or control of the state, but which is, in fact, in the possession or control of other governmental personnel, the state shall use diligence and make good faith efforts to cause such materials to be made available to the defense counsel, and if the state's efforts are unsuccessful and such material or other governmental personnel are subject to the jurisdiction of the court, the court, upon request, shall issue suitable subpoenas or orders to cause such material or information to be made available to the state for disclosure to the defense.

> In his request for discovery, the appellant stated, *inter alia:* "The defendant requests that the prosecuting attorney make a diligent, good faith effort to obtain any of the above items or information which may be in the possession or control of any other government personnel, under the authority of Rule 25.03(c)."

The State contends that there was no discovery violation, as alleged by the appellant, warranting a new trial because it had no duty under the rule or *Brady* to furnish to the defense the transcript of Bartels's revocation hearing testimony in that: (1) for discovery purposes, it was not in its possession or control, and it was not aware of the transcript until trial; and (2) it was a matter of public record which could have been readily obtained by the defense using due diligence. The State further contends that even assuming, *arguendo*, that these issues were resolved in the appellant's favor, it still had no duty under *Brady* to furnish the transcript to the defense because it was not material to his case. For the reasons discussed, *infra*, we agree with the State's assertion that its failure to disclose to the defense the transcript of Bartels's testimony at the revocation hearing was not material to the appellant's case requiring a new trial.

■■■ "The *Brady* rule is based on the requirement of due process." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481, 489 (1985). It "requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *Id.* at 674, 105 S.Ct. 3375 (citations omitted); *see also State v. Shafer*, 969 S.W.2d 719, 740–41 (Mo.*banc*), *cert. denied*, ─── U.S. ───, 119 S.Ct. 419, 142 L.Ed.2d 340 (1998). "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375. For purposes

of the rule, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. 3375; *see also Shafer*, 969 S.W.2d at 741; *State v. Weaver*, 912 S.W.2d 499, 514–15 (Mo. *banc* 1995). Under the rule, the "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375 (*citing United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342, 354–55 (1976)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995). Thus, a constitutional error occurs under the *Brady* rule, requiring reversal of the defendant's conviction and a new trial, "if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 677–78, 105 S.Ct. 3375.

■■ In the case at bar, the appellant was convicted of second degree felony murder under § 565.021.1(2), based on an information and a verdict-directing instruction patterned after MAI–CR 3d 313.06 [Revised Oct. 1, 1998],[4] which hypothesized that he attempted to commit

---

4. The "**MURDER IN THE SECOND DEGREE: FELONY**" instruction provides:

((As to Count ___, if) (If) you do not find the defendant guilty of (murder in the first degree) (murder in the second degree as submitted in Instruction No. ___ ), you must consider whether he is guilty of murder in the second degree (under this instruction).)

(As to Count ___, if) (If) you find and believe from the evidence beyond a reasonable doubt:

First, that defendant (committed) (attempted to commit) [*Insert name of underlying felony, such as "robbery in the second*

*degree."* ], as submitted in Instruction No. ___, and

Second, that [*Describe briefly how victim was killed. See Notes on Use 3 for suggestions.*], and

Third, that [*name of victim* ] was killed as a result of the (perpetration) (or) (attempted perpetration) (or) (immediate flight from the (perpetration) (or) (attempted perpetration)) of that [*name of felony,*]

then you will find the defendant guilty (under Count ___ ) of murder in the second degree.

MAI–CR 3d 313.06.

the felony of possession of a controlled substance, cocaine, under § 195.202, and that Riley was killed as a result of the appellant's attempted perpetration of this felony. Section 565.021.1 provides:

1. A person commits the crime of murder in the second degree if he:

. . .

(2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

Thus, under this statute and the verdict director given, in order to obtain a conviction for second degree felony murder against the appellant, the State was required to show that the victim, Riley, was killed during an attempt by the appellant to possess a controlled substance.

There was no dispute at trial as to whether Riley died during the attempted perpetration of a felony drug deal; the only issue was whether the appellant was acting in concert with Riley in the planned exchange of the drugs. There was substantial evidence to support the jury's finding that the appellant was involved in Riley's plan to acquire illicit drugs. In this respect, the appellant spoke with Riley before Riley confirmed that he wanted to purchase the drugs; he accompanied Riley around town and twice to the Motel 6 on July 30, 1997; he was involved in several communications about the drug deal, including Riley's call to the motel from a pay phone; and he was apparently serving as a lookout outside the motel at the time of the fatal incident. Thus, given the State's burden of proof at trial and the issues in dispute, the relevant inquiry for the jury as to the appellant's guilt or innocence was whether he knew that Riley and Bartels were engaged in a drug deal at the time of Riley's death and he aided or encouraged Riley in the planned exchange of the drugs. It was not required to show that both Bartels and LanFranca had met with Riley to discuss his plans to rip off drug dealers. Consequently, whether LanFranca was present during any discussions between Bartels and Riley concerning such plans was irrelevant to the State's required proof as to the appellant's guilt or innocence of felony second degree murder.

The appellant contends that Bartels's testimony at the revocation hearing was material because it "struck at the heart of [his] defense," in that it was contrary to the State's theory of the case, that the appellant was aware of Riley's intent to kill Bartels and steal the cocaine, but LanFranca was not. Even accepting that this was the State's "theory" of the case, given the proof requirements to convict the appellant as charged, the fact that LanFranca knew of Riley's plans would not constitute any recognized legal defense to the charges against the appellant. Its only bearing on the appellant's guilt or innocence would have been to discredit the trial testimony of Bartels and LanFranca such that the jury would not believe their testimony as to material facts that did bear on the appellant's guilt or innocence. As such, the fact that Bartels testified one way at the revocation hearing and another way at trial as to LanFranca's presence during discussions between Bartels and Riley concerning plans to rip off drug dealers was not directly relevant to a determination of the appellant's guilt or innocence and would have served only to impeach Bartels's and LanFranca's testimony at trial.

■ As to the necessity of the transcript of Bartels's revocation hearing testimony at trial to allow the appellant to impeach Bartels and LanFranca with respect to their discussions with Riley concerning his plans to rip off drug dealers, the appellant contends that it was essential to the outcome of his case such that its alleged suppression by the State served to deny him his constitutional rights to due

process and a fair trial, requiring reversal of his conviction and a new trial. Hence, the question we must answer in determining whether there was a *Brady* violation entitling the appellant to a new trial, as alleged by him, is whether there was a reasonable probability that the outcome of his case would have been different if the State had not allegedly suppressed the transcript so as to prevent him from using it to impeach Bartels's and LanFranca's trial testimony concerning their discussions with Riley to rip off drug dealers and then kill them. In other words, was the alleged suppression of the transcript by the State material to the appellant's case, in the context of the *Brady* rule, in that had it been disclosed to the defense by the State, it could have been used by the appellant at trial to impeach Bartels and LanFranca such that there would have been a different outcome in his case? *Bagley*, 473 U.S. at 677–78, 105 S.Ct. 3375.

The record reflects that both Bartels and LanFranca testified at trial that they were aware of Riley's plans to rip off drug dealers. Hence, the only true controversy as to the impeachment value of the transcript centers on the trial testimony of Bartels and LanFranca as to whether Lan-Franca ever was present when Bartels and Riley discussed Riley's plans. Although, as noted, *supra*, impeachment evidence can be material for purposes of the *Brady* rule, for the reasons discussed, *infra*, we cannot say, under the totality of the circumstances presented, that it was material here.

As to whether the transcript was material with respect to discrediting Bartels's trial testimony, the record reflects otherwise. Even without the transcript, the record reflects that Bartels's credibility was squarely in issue at trial. In this respect, it was disclosed to the jury that Bartels had several misdemeanor and felony convictions and had agreed to be an informant for the federal government so that other charges against him would not

be pursued. In addition, Bartels testified that the FBI had paid him close to $60,000 for his services as an informant. Moreover, it is undisputed that Bartels was, in fact, impeached by the appellant at trial on the issue of whether LanFranca was present during Bartels's discussions with Riley in that, when confronted on cross-examination with the FBI report of its investigation, which indicated that he had told the FBI that LanFranca was present during such discussions, he admitted that he had lied to the FBI, but was telling the truth at trial. At best, for the appellant, impeachment of Bartels with the transcript would have been cumulative on the issue of his credibility and not material on any issue as to guilt or innocence. *See State v. Rousan*, 961 S.W.2d 831, 844 (Mo.*banc*), *cert. denied*, —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). In light of the foregoing and the fact that the testimony in question did not directly bear on any issue of the required proof to convict or a recognized defense to the charges against the appellant, we fail to see how the State's failure to provide the transcript to him, so as to impeach Bartels, would undermine confidence in the jury's verdict, violating due process and requiring a new trial. *Bagley*, 473 U.S. at 677–78, 105 S.Ct. 3375.

With respect to attacking LanFranca's credibility at trial, we also fail to see how the transcript was material to the outcome of the appellant's case. The record reflects that even without the transcript, his credibility was under attack on several fronts. At trial, he testified that he was currently incarcerated as a result of the events of January 30, 1997, and that he had worked out a deal with the federal government in which he would receive a lesser sentence on other pending charges if he testified against the appellant in this case. He also candidly admitted, while testifying, that he had repeatedly lied in various legal proceedings in the past for his own benefit. In this respect, he testi-

fied under cross-examination by the defense:

Q. You will lie under oath?

A. I have lied under oath. That's what I'm saying.

Q. And you will lie under oath to benefit yourself?

A. Again, I've lied under oath to benefit myself.

Q. To keep from going to jail?

A. Yes.

Q. You were willing to lie under the oath of God and the oath of a federal court to stay out of trouble, to keep from going to jail?

A. Yes.

Q. Let's see who you lied to. You lied to a Federal District Judge?

A. Yes.

Q. You lied to the FBI?

A. Yes.

Q. You've lied to a federal probation officer?

A. Yes.

Q. You've lied to your own father about what happened?

A. Yes.

Q. You've lied to Mrs. Albanese?

A. Yes.

Q. You've lied to Travis Riley, the victim's dad?

A. Yes.

Q. You've lied to the IRS?

A. Yes.

Q. You've lied to the Oklahoma authorities?

A. Yes.

Q. Did I miss anybody?

A. How far back – yeah, I mean.

Q. You've lied to a lot of people. You don't have a problem lying do you?

A. Yeah, I've lied to people, yes.

Defense counsel continued to call into question LanFranca's credibility by reading questions and answers from his deposition and asking him whether the answers given were truthful. He admitted that he had lied in over twenty instances.

Without question, by his own admissions, the jury was made acutely aware of the fact that LanFranca was a liar whose testimony would have to be closely scrutinized. As such, just as in the case of Bartels, impeachment of LanFranca with the transcript would have been, at best, cumulative on the issue of his credibility. *Rousan*, 961 S.W.2d at 844. In light of this fact, the trial court, in denying the appellant's motion for a new trial, could have reasonably found that the absence at trial of the transcript of Bartels's revocation hearing testimony for use by the appellant to impeach LanFranca on the issue of whether he was present when Bartels and Riley discussed Riley's plans to rip off drug dealers did not undermine confidence in the jury's verdict of guilty, such that a due process violation occurred, requiring a new trial. *Id.*

### B. Conviction Based on Perjured Testimony

■ The appellant also claims in Point I that he was entitled to a new trial because the State knowingly obtained his conviction using perjured testimony. Specifically, he contends that the undisclosed transcript of Bartels's revocation-hearing testimony demonstrates that the prosecution's case included perjured testimony concerning whether LanFranca was present when Bartels and Riley were discussing ripping off drug dealers. We disagree.

■ As a general rule "a conviction which results from the deliberate or conscious use by a prosecutor of perjured testimony violates due process and must be vacated." *State v. Mims*, 674 S.W.2d 536, 538 (Mo. *banc* 1984) (*citing, inter alia, United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)); *see also State v. Cummings*, 838 S.W.2d 4, 7 (Mo.App.1992); *Shavers v. State*, 758 S.W.2d 132, 133 (Mo.App.1988); *Smith v.*

*State,* 714 S.W.2d 778, 781 (Mo.App.1986). In *Agurs,* the United States Supreme Court recognized that the *Brady* rule applied to three situations of nondisclosure, including the situation where the prosecution obtains a conviction based on perjured testimony when it knows or should have known of the perjury at the time of trial based on evidence in its possession, which had not been disclosed to the defendant. *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392. The due process violation is based, *inter alia,* on the fact that the prosecution, by not disclosing evidence, which is contrary to the evidence relied upon by it for conviction, creates an appearance that it was attempting to "corrupt[ ] the truth-seeking function of the trial process," *id.* at 104, 96 S.Ct. 2392, which would undermine confidence in the outcome of the trial, rendering the undisclosed evidence material to the outcome of the case. In this respect, the court in *Bagley,* decided after *Agurs,* held that the materiality standard of the *Brady* rule, discussed, *supra,* applied to the "perjury situation" of nondisclosure discussed in *Agurs. Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. *See State v. Aaron,* 985 S.W.2d 434, 436 (Mo.App.1999); *State v. Carter,* 939 S.W.2d 556, 557 (Mo.App. 1997). It is this situation which the appellant contends existed here.

■ To prevail on his claim that he was denied due process because he was convicted through the use of perjured testimony, the appellant had the burden to prove that: "(1) [Bartels's and LanFranca's] testimony was false; (2) the state knew it was false; and (3)[his] conviction was obtained as a result of the perjured testimony." *Cummings,* 838 S.W.2d at 7. Under this required proof, the appellant was not only required to demonstrate that Bartels's and LanFranca's trial testimony was false, but that it was perjured. For testimony to be perjured, it must not only be false, but must relate to a *"material fact"* in the case. § 575.040.1 (emphasis added); *State v. Fletcher,* 948 S.W.2d 436, 438 (Mo.App.1997). " 'A fact is material,

regardless of its admissibility [under rules of evidence], if it could substantially affect, or did substantially affect, the course or outcome of the ca[u]se, matter or proceeding.' " *Fletcher,* 948 S.W.2d at 438 (*quoting* § 575.040.2); *see also State v. Leitner,* 945 S.W.2d 565, 574 (Mo.App.1997). To this materiality standard for determining perjured testimony, we are required to overlay the materiality standard of the *Brady* rule, as enunciated in *Bagley* and discussed, *supra,* in determining if a due process violation occurred, as the appellant claims. *See Aaron,* 985 S.W.2d at 436; *Carter,* 939 S.W.2d at 557.

■ As to the first element of proof to establish the appellant's claim, the appellant asserts that the evidence of Bartels's and LanFranca's trial testimony being false was Bartels's inconsistent testimony at the revocation hearing and his inconsistent statement given to the FBI concerning LanFranca's presence at meetings between Bartels and Riley. Inconsistent statements made prior to trial are not alone sufficient to establish that a witness has committed perjury. *Shavers,* 758 S.W.2d at 133 (*citing State v. Lee,* 617 S.W.2d 398, 403 (Mo.1981)). Such statements generally go to the witness's credibility and can be used to cross-examine him or her. *Id.* When confronted at trial with the inconsistency between his trial testimony and his statement in the FBI report, Bartels testified that his trial testimony was the truth and that he had lied in the FBI report. In denying the appellant's motion for new trial, based on the appellant's claim that he was convicted with perjured testimony, the trial court was free to believe Bartels's trial testimony that he had lied previously and that his trial testimony as to the issue in question was truthful. As such, the appellant's claim of being convicted on perjured testimony would fail in that the trial court was free to find, in denying the appellant's motion for new trial, that Bartels's and LanFranca's trial testimony as to Lan-

---

Franca's presence at discussions between Bartels and him was not false.

Even assuming, *arguendo*, that the record was such for us to find that the trial court erred in not finding that the testimony in question was false and that the State knew that it was, to succeed on his claim that he was convicted on perjured testimony, he would still have to show that Bartels's and LanFranca's trial testimony was material in that it would have changed the outcome of his case. *Carter*, 939 S.W.2d at 557; *Cummings*, 838 S.W.2d at 7. As discussed, *supra*, in the perjured-testimony situation of nondisclosure, the third element of a due process claim based thereon, that the prosecution obtained a conviction based on known perjured testimony, *Cummings*, 838 S.W.2d at 7, is required to encompass the materiality standard of the *Brady* rule, that the alleged perjured testimony undermined the confidence in the jury's verdict of guilty. Given our discussion, *supra*, concerning the materiality of Bartels's testimony at the revocation hearing and trial and LanFranca's trial testimony, we cannot conclude that the trial court abused its discretion in finding that the appellant was not entitled to a new trial based on the appellant's due process claim that he was convicted by known perjured testimony.

For the reasons discussed, appellant's Point I is denied.

## II.

In Point II, the appellant claims that the trial court erred in overruling his motions for a mistrial because the State violated its order *in limine* in three instances. Specifically, the appellant contends that the trial court erred in admitting testimony concerning statements allegedly made by the appellant to Riley. We disagree.

### Standard of Review

The standard of review for a trial court's refusal to grant a mistrial is abuse of discretion. *State v. Johnson*, 968 S.W.2d 123, 134 (Mo.*banc*), *cert. denied*, — U.S. —, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998); *State v. Rodriguez*, 985 S.W.2d 863, 865 (Mo.App.1998). "The decision whether to declare a mistrial rests largely within the discretion of the trial court because the trial court has observed the incident that precipitated the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the indicent had on the jury." *State v. Webber*, 982 S.W.2d 317, 322 (Mo.App.1998) (*citing State v. Schneider*, 736 S.W.2d 392, 401 (Mo. banc 1987)). " 'Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration....' " *Jackson*, 969 S.W.2d at 775 (*quoting King*, 853 S.W.2d at 307). " 'Granting a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudice to the defendant cannot be removed any other way.' " *State v. Wyman*, 945 S.W.2d 74, 77 (Mo.App.1997) (*quoting State v. Jones*, 921 S.W.2d 28, 31–32 (Mo.App.1996)); *see also State v. Barnett*, 980 S.W.2d 297, 305 (Mo. banc 1998), *cert. denied*, — U.S. —, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999).

### Discussion

A trial court's ruling on a motion *in limine* is interlocutory and subject to change in the course of a trial and preserves nothing for appellate review. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992); *State v. Stephan*, 941 S.W.2d 669, 674 (Mo.App.1997); *State v. Boulware*, 923 S.W.2d 402, 404 (Mo.App.1996). "The trial court's action of sustaining the pretrial motion in limine does not act as an automatic, permanent bar to the evidence sought to be excluded." *Stephan*, 941 S.W.2d at 674 (*citing State v. Evans*, 639 S.W.2d 820, 822 (Mo.1982)). As such, a trial court, having initially excluded the evidence pursuant to a pretrial motion *in*

*limine,* is free to change its ruling at trial and admit it. *Id.* Hence, in order to afford the trial court with an opportunity to reconsider its previous ruling, the proponent of the excluded evidence may attempt to present the excluded evidence at trial. *Id.* Of course, such an attempt would be subject to any restrictions imposed by the trial court as to the manner in which this is to be done, for example, requiring counsel to approach the court, outside the hearing of the jury, and advise the court that he or she intends to introduce the excluded evidence and why it is now admissible. *Martin v. Durham,* 933 S.W.2d 921, 925 n. 3 (Mo.App.1996). This would afford the opponent of the evidence an opportunity to renew his or her objection to the admission of the evidence, and assuming that he or she did, this would allow the trial court to reconsider and rule on its admissibility, outside the hearing of the jury.

◼ The procedure described in offering evidence at trial that had previously been excluded by an order *in limine* recognizes the dual purpose of a motion *in limine.* Although one purpose of a pretrial motion *in limine* is obviously to exclude inadmissible evidence at trial, it also serves the second purpose of prohibiting a party from placing an improper and prejudicial issue before the jury through *voir dire,* opening statement, or questions during trial, which are not evidence. *Id.* The rationale for the second purpose is based on the fact that in certain circumstances the mere act of raising the issue, regardless of the fact that no inadmissible evidence is admitted, is so prejudicial that the prejudice cannot be removed by refusing to admit the evidence being offered. *Id.* Stated another way, once the bell is rung, it cannot be unrung. Hence, if a party seeks to admit evidence at trial which was previously excluded by an order *in limine,* it runs the risk of a mistrial should the trial or appellate court find that, despite the fact the inadmissible evidence was ultimately excluded at trial, the damage was done in that the manner in which the party sought to introduce the evidence had the same prejudicial effect as if the evidence had, in fact, been admitted.

◼ Here, the appellant filed a pretrial motion *in limine* requesting, *inter alia,* that the trial court prohibit the State from mentioning as hearsay "any statements attributed to [the appellant] made to Joe Riley (deceased) and reported to the state's witnesses." With respect to this issue, the appellant's motion was sustained. He contends that the State violated the trial court's ruling in the following three instances during its direct examination of LanFranca:

1. A. I said, "No. What do you need a gun for"?

[Riley] said that he had-had a couple of things goin' on in the near future where he was gonna need one.

He goes, "But today I've got this guy comin' in from Chicago with five kees. Me and [the appellant] are gonna go meet him and [the appellant is] gonna get rid of 'em for me."

Q. And whenever he says, "He and [the appellant] and gonna go meet him and [the appellant is] gonna get rid of it" –

2. Q. And whenever the [appellant] walks out of the bathroom, what happens, at that point?

A. [Riley] tells [the appellant] that he can't use The Diner. We can't use The Diner, because of my dad.

Q. And what happens then?

A. [Riley] says, "So where we gonna do this deal"?

[The appellant] says, "I don't care where we" –

3. Q. And can you tell the jury what this [appellant] was saying, during that trip?

A. Just remove everybody else's conversation and just his input? Is that what you want?

Q. That's what you're gonna have to do.

A. Okay.

In the first two instances, LanFranca was attempting to testify to statements made by the appellant, which were reported by Riley. In the third instance, no actual statements of the appellant were involved, rather he complains simply about the prosecution's admonishment of LanFranca, in the presence of the jury and after repeated objections by the appellant, to restrict his testimony to what the appellant had said with him being present. In the first two instances, the appellant objected to the admission of the excluded evidence and requested a mistrial. Although the trial court sustained the objections and excluded the evidence, it overruled his motions for a mistrial. In the third instance, in which no evidence was being offered, the appellant objected and moved for a mistrial, which objection and motion were overruled, although the trial court instructed the assistant prosecutor to limit her comments. Given these circumstances, it is clear that the appellant is basing his claim of error on the fact the State violated the spirit of the trial court's order *in limine* by the manner in which it sought to introduce the excluded evidence at trial.

The State contends that the challenged testimony of LanFranca did not violate the trial court's order sustaining the appellant's pretrial motion *in limine* in that the order only excluded inadmissible "double hearsay" testimony and LanFranca's testimony did not fall in that category because it either was admissible as admissions of the appellant or as statements of a co-conspirator. As to the prosecutor's admonition of LanFranca in the presence of the jury, the State contends that this also did not violate the trial court's order *in limine* and that it was the product of incorrect evidentiary rulings by the trial court as to the admissibility of the evidence in question, more likely to be interpreted by the jury as an attempt by the State, not the defense as the appellant contends, to limit what the jury could hear.

Even assuming, *arguendo,* that the trial court's order *in limine* encompassed all the challenged testimony of LanFranca, which the appellant challenges on appeal, the State was free to attempt to introduce any evidence excluded by the court's order. *Stephan,* 941 S.W.2d at 674. As such, given the fact the objectionable evidence was excluded at trial, the State's attempt to introduce this testimony would not be violative of the trial court's order *in limine,* unless it could be reasonably found that the manner in which the State did so violated the spirit of the order in that the prejudice sought to be avoided by the order nonetheless resulted.

After a careful review of the record, we fail to see how the trial court abused its discretion in failing to grant a mistrial on the basis of the three alleged "violations" of its order *in limine.* As stated, *supra,* a mistrial is a drastic remedy and is not to be imposed unless no other means is effective in removing the prejudice. Any prejudice resulting from the challenged questioning of LanFranca by the State would have been slight, in light of the fact that the alleged inadmissible evidence was excluded and given the other direct evidence in the record of the appellant's involvement in the drug deal, which formed the basis for his felony murder conviction.

Point denied.

## III.

In Point III, the appellant claims the trial court erred in not declaring a mistrial, *sua sponte,* because the assistant prosecutor made several improper references in her closing argument concerning her personal beliefs as to the appellant's guilt. The claim is without merit.

### Standard of Review

A " 'trial court has sound discretion in determining whether closing argument has had a prejudicial effect so as to warrant a mistrial, and its judgment will not be disturbed on appeal unless there is a manifest abuse of discretion.' " *Bowls v.*

*Scarborough,* 950 S.W.2d 691, 699 (Mo. App.1997) (*quoting Amador v. Lea's Auto Sales & Leasing, Inc.,* 916 S.W.2d 845, 851 (Mo.App.1996)). This is so because "[t]rial courts have a superior vantage point from which to assess the pervasive effect of an improper argument." *State v. Weaver,* 912 S.W.2d 499, 513 (Mo. banc 1995). Therefore, whether any error "can be dissipated by timely and appropriate action short of declaring a mistrial is a matter within the sound discretion of the trial court." *Id.*

■■■■ " '[S]tatements made in closing arguments [seldom] affect substantial right[s] or result in manifest injustice or the miscarriage of justice so as to result in plain error requiring reversal of a conviction.' " *State v. Cruz,* 971 S.W.2d 901, 903 (Mo.App.1998) (*quoting State v. Higgins,* 619 S.W.2d 94, 95 (Mo.App.1981)). "Furthermore, courts hesitate to find plain error in a failure to *sua sponte* correct a statement made during closing arguments because 'trial strategy looms as an important consideration' in deciding whether to object during closing argument." *Id.* (*quoting State v. Cobb,* 875 S.W.2d 533, 537 (Mo. banc 1994)).

■■■■ During the State's rebuttal portion of its closing argument, the appellant objected to two comments by the assistant prosecutor on the basis of improper personalization. Both objections were sustained and the jury instructed to disregard the offending statements. Apparently satisfied with the court's rulings, the appellant did not request any further relief. As such, he did not preserve his claim of error for appellate review. *State v. Kee,* 956 S.W.2d 298, 305 (Mo.App.1997); *see also State v. Basile,* 942 S.W.2d 342, 350–51 (Mo. banc 1997); *Wyman,* 945 S.W.2d at 77. Given this fact, his claim that the trial court erred in failing to *sua sponte* grant him a mistrial would only be reviewable for plain error under Rule 30.20.

■■■■ Rule 30.20 provides, in pertinent part, that "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." " 'The plain error rule should be used sparingly and does not justify a review of every [alleged] trial error that has not been properly preserved for appellate review.' " *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc 1990) (*quoting State v. Valentine,* 646 S.W.2d 729, 731 (Mo.1983)); *see also State v. Silvey,* 894 S.W.2d 662, 670 (Mo. banc 1995).

■■■■ Plain error review involves a two-step process. Under the rule, the first step involves an examination to determine whether "plain error" has, in fact, occurred, or in other words, whether the claim for review "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.' " *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995) (*quoting* Rule 30.20). In the absence of such a determination, a court should "decline to exercise its discretion" to review a claim of error under Rule 30.20. *Id.* The rule makes it clear that not all prejudicial errors can be deemed plain errors. Plain errors are those which are "evident, obvious and clear." *State v. Bailey,* 839 S.W.2d 657, 661 (Mo.App.1992). If plain error is found on the face of the claim, then the rule authorizes, as a matter of court discretion, a second step to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

■■■■ The defendant bears the burden of showing that plain error has occurred which resulted in manifest injustice or a miscarriage of justice. *State v. Isa,* 850 S.W.2d 876, 884 (Mo. banc 1993). "Mere allegations of error and prejudice will not suffice." *Id.* "The determination [of] whether plain error exists must be based on a consideration of the facts and circumstances of each case." *State v. Cline,* 808 S.W.2d 822, 824 (Mo. banc 1991) (*citing State v. Sanders,* 541 S.W.2d 530, 533 (Mo. banc 1976)). When guilt is established by overwhelming evidence, no injus-

tice or miscarriage of justice results requiring relief under the rule. *State v. Jordan,* 627 S.W.2d 290, 293 (Mo. *banc* 1982) (*citing State v. Bainter,* 608 S.W.2d 429, 431 (Mo.App.1980)).

## Discussion

■ The appellant contends that the assistant prosecutor, in closing argument, impermissibly expressed her personal opinion as to his guilt. Specifically, he objects to the following argument of the assistant prosecutor:

And what we're telling you is you don't need Nick.

We didn't have him whenever we charged the [appellant] the day after the crime. He didn't talk about LanFranca, because we don't need him.

The day after the crime you bet we considered filing on Nick LanFranca. Our heart of hearts made us look to file against Nick LanFranca.

What are we firmly convinced of? What were our hearts telling us?

. . .

So what are we to do? We now have Nick LanFranca and we know no one, no Prosecutor wants to put on a snitch, but what do we do? Even though we know ,the [appellant's] guilty and our proof shows the [appellant] is guilty beyond a reasonable doubt, what do we do as Prosecutors?

As stated, *supra,* the appellant's objections to these comments were sustained and the jury instructed to disregard. According to the State, these comments referred back to comments made by defense counsel in his closing argument about the State "hiding" from LanFranca in its opening statement by not mentioning him and counsel's assertion that the State should have charged LanFranca with felony murder rather than use him as a witness. As such, the State contends that the comments in question were proper as retaliatory argument to the defense's closing argument, citing *State v. Clayton,* 995 S.W.2d 468, 479 (Mo. *banc* 1999); *State v. Petty,* 967 S.W.2d 127, 136[20] (Mo.App.1998);

*State v. Jones,* 979 S.W.2d 171, 177 (Mo. *banc* 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999). Unfortunately, the appellant did not see fit to include his closing argument in the transcript filed on appeal, which we find suspect. Although we would be justified in refusing plain error review of the appellant's claim on this basis alone, *State v. Kelly,* 823 S.W.2d 95, 98 (Mo.App.1991); *State v. Blackburn,* 789 S.W.2d 126, 128 (Mo.App.1990); *State v. Klaus,* 730 S.W.2d 571, 579 (Mo.App.1987), we need not do so.

As an alternative basis for denying plain error review, we find that the appellant's claim does not facially establish substantial grounds that manifest injustice or a miscarriage of justice resulted from the challenged closing argument of the State. This is so in that to reverse a conviction on plain error for improper argument, an appellant must show manifest prejudice affecting substantial rights. *Kee,* 956 S.W.2d at 303 (*citing State v. Clark,* 913 S.W.2d 399, 405 (Mo.App.1996)). In other words, the appellant must establish that the assistant prosecutor's comments had a decisive effect on the jury's determination such that the verdict would have been different. *Id.; Basile,* 942 S.W.2d at 349. Given the nature of the assistant prosecutor's remarks, the trial court's instruction to the jury to disregard them in response to the appellant's objections, and the admissible evidence in the case ,as to the appellant's guilt, we cannot find fairly that the appellant's claim facially establishes that manifest injustice or a miscarriage of justice resulted from her remarks in that we fail to see how the remarks changed the outcome of the verdict.

■ As a final reason for denying plain error review, we believe from the record that no error, plain or otherwise, occurred because the remarks in question were proper. Generally, a jury is presumed to follow the trial court's instructions to disregard any improper comments. *Wyman,* 945 S.W.2d at 78 (*citing State v. Bradley,* 811 S.W.2d 379, 382 (Mo. *banc* 1991)). In our case, the appellant's objections were sustained, with the trial court instructing

the jury to disregard the assistant prosecutor's comments. As a result, we may presume that no error occurred. *Id.* However, in this case, we need not rely solely on this presumption in finding no error, plain or otherwise.

 As a general proposition, the appellant is correct in his assertion that a prosecutor may not express his or her opinion in closing argument as to the guilt of the defendant in such a way that implies knowledge on the prosecutor's part based on evidence not in the record. *State v. Grant*, 702 S.W.2d 857, 864 (Mo.App.1985). However, prosecutors and defense attorneys are allowed substantial latitude in closing argument, *State v. Womack*, 967 S.W.2d 300, 303 (Mo.App.1998), including suggesting reasonable inferences to be drawn from the evidence. *Bowls*, 950 S.W.2d at 699 (*citing Moore v. Missouri Pac. R.R. Co.*, 825 S.W.2d 839, 844 (Mo. banc 1992)); *Weaver*, 912 S.W.2d at 512. As such, a prosecutor may express a belief as to the defendant's guilt if that opinion appears to be fairly based on the evidence. *Weaver*, 912 S.W.2d at 512; *State v. Link*, 965 S.W.2d 906, 912 (Mo.App.1998); *State v. Boyd*, 954 S.W.2d 602, 610–11 (Mo.App. 1997). In light of these legal principles, it is our view that the remarks of the assistant prosecutor in question were not improper, and that the trial court would have been justified in overruling the appellant's objections thereto but chose not to, which we in no way fault. The fact that the challenged closing argument, in our view, was not objectionable, we obviously would decline plain error review.

Point denied.

### Conclusion

The circuit court's judgment of the appellant's jury conviction for murder in the second degree, § 565.021.1(2), is affirmed.

All concur.